316 Ga. 796
FINAL COPY

S23A0322.  BURLEY v. THE STATE.

ELLINGTON, Justice.

A Calhoun County jury found Undrea Burley guilty of felony murder in connection with the beating death of Joshua Brooks.[1] Burley contends the trial court committed plain error by failing to instruct the jury sua sponte on the elements of malice murder

---

[1] On March 30, 2017, a Calhoun County grand jury indicted Undrea Burley and co-defendants Wesley Adams, Shakera Burns, and Demetrious Smith for offenses in connection with the beating death of Joshua Brooks, an inmate of Calhoun State Prison. In Count 1 of the indictment, Burley, Adams, Burns, and Smith were charged with felony murder predicated on aggravated assault ("irrespective of malice"); in Count 2, they were charged with aggravated assault "with intent to murder." In Count 3, Burley, Adams, and Smith were charged with violating the Street Gang Terrorism and Prevention Act. In Count 4, Smith was separately charged with violating the Street Gang Terrorism and Prevention Act. The charges against Burns (a corrections officer) were severed, and she was to be tried separately. The jury acquitted Smith of all charges. The trial court directed a verdict of not guilty as to Count 3 of the indictment, and the jury found Adams and Burley guilty on Counts 1 and 2. At sentencing, the trial court merged Count 2 into Count 1. The trial court sentenced Burley to life in prison without the possibility of parole on Count 1. Burley filed a timely motion for a new trial on December 21, 2018, and amended it on September 12, 2019. The trial court denied the motion on September 14, 2020. Burley filed a notice of appeal on September 23, 2020, and the appeal was docketed in this Court to the term beginning in December 2022 and orally argued on March 29, 2023.

because the indictment charged Burley and his co-defendants, Wesley Adams and Demetrious Smith, with felony murder predicated on "aggravated assault with intent to murder." As explained below, the trial court's instructions concerning the offenses of felony murder and aggravated assault with intent to murder, though erroneous, did not constitute plain error requiring reversal. Therefore, we affirm the judgment of conviction.

The evidence presented at trial showed the following. At about 9:00 p.m. on June 9, 2016, cell block H-1 of the Calhoun State Prison was "put on lockdown" following a fight between inmates. Prison surveillance video reveals that, as the lockdown began, inmates Burley, Adams, and Brooks entered cell 107 of the H-1 block just before the cell doors closed and locked. An hour and a half later, Corrections Officer Shakera Burns can be seen slipping a note beneath the door of cell 107. Security video recordings show that cell 107 — and all of the cells on cell block H-1 — remained locked from 9:00 p.m. on June 9 until shortly after noon the following day. A video recording of the cell block shows that the inmates began

2

leaving their respective cells as soon as the cell doors opened at 12:12 p.m. on June 10. The video also shows several emergency response officers entering the cell block to maintain order. At 1:03 p.m., after speaking with an inmate who approached him, a corrections officer walked to and entered cell 107. Seconds later, the officer called for the cell block to be locked down again.

One of the prison's emergency response officers testified that he was summoned to cell 107 after the cell block was put on lockdown for the second time. Once there, he found Brooks on the bottom bunk, "laying there stiff." He concluded that Brooks was dead because "rigor mortis had set in." Nevertheless, prison medical personnel moved Brooks's body to the floor outside the cell and began CPR. At about 4:00 p.m., agents of the Georgia Bureau of Investigation arrived to investigate the death and to process the crime scene.

GBI Agent Chris Samra testified that, when he arrived at the cell block, he noticed that Brooks's body, though clearly presenting signs of "blunt force trauma, shoe prints, [and] numerous defensive

3

wounds," was unusually clean and devoid of blood, leading him to believe that "somebody cleaned the stuff up." Agent Samra also smelled "a strong odor of a cleaning agent," which he suspected was "Clorox" bleach, coming from inside cell 107. He observed that the cell walls had been "wiped down." While a forensic team processed the cell, GBI agents reviewed the prison's security video recordings.

The security video recordings, which were played for the jury, showed that at 12:12 p.m. Burley and Adams emerged from cell 107 and stood together for a few moments, blocking the entrance to the cell as corrections officers and inmates walked by them. Then, at 12:36 p.m. Adams took items from the cell and put them in a trashcan. Moments later, co-defendant Smith joined Adams and Burley and helped them mix cleaning solutions together in a bottle. Adams took the bottle and returned to cell 107.

Inmate Brandon Walker testified that he spoke with Brooks just before the lockdown and observed that Brooks appeared healthy and uninjured. Inmate Jason White testified that he heard what he assumed was Brooks being beaten throughout the night of June 9

4

by his cellmates, Adams and Burley. He also heard "a lot of catcalling and hollers from other cells, [about] what to do to that boy that night." Inmate Demetrious Teague gave a statement to investigators that Smith had ordered his fellow gang members, Adams and Burley, to beat Brooks to death. At trial, however, he denied having heard such orders.

Following the discovery of Brooks's body in cell 107, Adams and Burley were taken to separate cells. A corrections officer testified that, as he walked Adams to a cell, Adams asked him if he was going to be interviewed by an investigator. When the officer responded "yes," Adams volunteered that he, Burley, and Brooks had been "wrestling" in cell 107 that night.

In cell 107, investigators identified several items that belonged to Brooks, Burley, and Adams. They found blood-stained white towels that smelled of bleach on top of a locker inside the cell. They recovered a bottle containing a cloudy white liquid that also smelled of bleach. They found blood residue throughout cell 107, including on the walls, toilet, lockers, desks, door frame, radiator heater,

5

bunkbed, and bed ladder. The investigators also examined the clothing Burley was wearing on June 10. Although his outer garments were clean, they found bloodstains on Burley's socks and boxer shorts.

The investigators collected four bags containing items that Adams had put in the trashcan. The bags contained damp clothing and white bedsheets that smelled of bleach and had what appeared to be bloodstains. The investigators identified Brooks's blood-spattered pants and Burley's prison-issued pants, braided belt, and blood-spattered white t-shirt. They also found a round, metal combination lock inside a white sock — an item an officer testified could be used as a weapon. Brooks's personal items, other clothing, and an identification card were also recovered from the bags of trash. Although most of the blood samples analyzed were too degraded by bleach for DNA-testing, investigators were able to extract DNA from a bloodstain on Adams's boot. That DNA sample matched Brooks's DNA profile. Fingernail clippings from Burley and Brooks did not yield any identifiable DNA for comparison purposes.

Investigators photographed injuries that Burley and Adams had recently sustained to their bodies. Those photographs, which were introduced in evidence, showed the following: Burley's left eye was bloodshot; he had scratches on his body and face; his knuckles were bruised; and he had a bite mark on his body. Adams had sustained similar recent injuries.

A GBI forensic pathologist autopsied Brooks's body. The autopsy revealed that Brooks suffered numerous deep, blunt-force injuries to his head, forearm, chest, abdomen, arms, and legs. Brooks's head was so battered that it was asymmetrical, lumpy, swollen, and "very pliable, mushy. It kind of felt like Play-Doh[.]" His brain had swollen "massively," as a result of blunt force injury. He suffered seven broken ribs on the right side of his body and six on the left, and he had a large amount of blood in his chest cavity. Some of Brooks's wounds had patterns that matched those of the combination lock that Adams put in the trash. Brooks's injuries were "layered" and showed different rates of swelling, indicating that the beating had occurred over "an extended period of time."

The pathologist testified that Brooks's injuries occurred within 12 hours of his death, and some may have been inflicted as he died. His body showed signs of "agonal" vomiting, which occurs when someone is dying of severe injuries. The pathologist explained that it was very unlikely that Brooks sustained his injuries before he entered the cell because Brooks could not have walked unaided into cell 107 with his severe head injuries and numerous broken ribs. The pathologist opined that Brooks likely lingered in a comatose or semi-comatose state for a period of time after his beating and before his death. The pathologist determined that Brooks's death was a homicide and that all of his injuries contributed to his death.

In his sole claim of error, Burley contends that the trial court committed plain error "when it failed to instruct the petit jury on the elements of malice murder because the grand jury indicted [Burley] for the crime of aggravated assault with intent to commit murder." Burley contends this erroneous instruction tainted the jury's verdicts for both aggravated assault and felony murder.

The record shows that the State indicted Burley and his co-

defendants as follows. In Count 1, the defendants were charged

> with the offense of Felony Murder for that the said accused . . . , while in the commission of a felony, Aggravated Assault, did cause the death of Joshua Brooks, a human being, irrespective of malice, by participating in the beating or allowing the beating of said victim Joshua Brooks resulting in and causing broken ribs, blunt force trauma and death, contrary to the laws of said State, the good order, peace and dignity thereof.

In Count 2, the defendants were charged

> with the offense of Aggravated Assault for that the said accused . . . , did make an assault upon the person of Joshua Brooks with intent to murder by beating or allowing the beating of said victim, causing numerous injuries to victim, including broken ribs and blunt force trauma and death, contrary to the laws of said State, the good order, peace and dignity thereof.

It does not appear from the record that the parties filed written requests to charge that defined the specific crimes set forth in the indictment. Rather, it appears that the trial court supplied the parties with a copy of its proposed charge prior to the close of evidence. During the charge conference, neither the judge nor counsel commented on any apparent conflict between the lack of a malicious intent to kill element in the felony murder count

9

("irrespective of malice") and the specific intent to murder element in the aggravated assault count as drafted ("with intent to murder").[2] Nor was there any discussion concerning the type of aggravated assault[3] asserted as the predicate offense or whether the felony murder count set forth *within that count* the crime of aggravated assault or relied on the *separate* aggravated assault count to supply the elements of the required predicate offense.[4]

---

[2] "Unlike malice murder, felony murder does not require intent to kill; rather, the defendant only must have intended to commit the underlying felony." *Oliver v. State*, 274 Ga. 539, 540 (2) (554 SE2d 474) (2001). In this case, if the separate aggravated assault count (Count 2) was intended to supply the underlying predicate felony for the felony murder count (Count 1), there exists a conflict between the "irrespective of malice" language in the felony murder count and the "intent to murder" language in the separately charged aggravated assault count. In a prosecution for murder, the express or implied malice the State must prove beyond a reasonable doubt "incorporates the intent to kill." *Latimore v. State*, 262 Ga. 448, 450 (421 SE2d 281) (1992).

[3] OCGA § 16-5-21 (a) provides, in pertinent part, that "[a] person commits the offense of aggravated assault when he or she assaults: (1) With intent to murder, to rape, or to rob; (2) With a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]"

[4] "In order to satisfy due process when an indictment charges a compound felony such as felony murder, the count charging the compound offense must contain the essential elements of the predicate offense, or the indictment must contain a separate count charging the predicate offense completely, or the indictment must elsewhere allege facts showing how the compound offense was committed." (Citation omitted.) *Stinson v. State*, 279 Ga. 177, 178 (2) (611 SE2d 52) (2005); see also *Mikenney v. State*, 277 Ga. 64, 65 (1) (586 SE2d 328) (2003) ("[A]n indictment which omits an essential element

10

Nevertheless, the trial court assumed that Count 2 supplied the predicate offense for Count 1 and instructed the jury on felony murder and aggravated assault as follows:

> A person commits the crime of murder when in the commission of a felony that person causes the death of another human being. Under the laws of Georgia, aggravated assault is a felony and defined as follows: A person commits the offense of aggravated assault as alleged in this indictment when the person assaults another person with intent to murder. The intent to murder is a material element of aggravated assault as charged in this case.
>
> In deciding the question of intent, you may consider all of the facts and circumstances of the case as well as the character of the weapon used and the manner in which it was used, if you find that a weapon was used. To constitute such an assault, actual injury to the alleged victim need not be shown. It's only necessary that the evidence show beyond a reasonable doubt that the defendant or defendants intentionally committed an act that placed the alleged victim in reasonable fear of immediately receiving a violent injury.
>
> If you find and believe beyond a reasonable doubt that the defendant or defendants committed the homicide alleged in this bill of indictment at the time the defendant

of the predicate offense in a count charging a compound offense can nonetheless satisfy the requirements of due process as long as the indictment charges the predicate offense completely in a separate count." (citations and punctuation omitted)); *Dunn v. State*, 263 Ga. 343, 344 (2) (434 SE2d 60) (1993) (same). Although the record is silent on whether the State had intended Count 2 to supply the essential elements of the predicate felony, during oral argument, the District Attorney asserted on behalf of the State that Count 2 was intended to supply the predicate felony for Count 1.

11

or defendants were engaged in the commission of the felony of aggravated assault, then you would be authorized to find the defendant or defendants guilty of murder, whether the homicide was intended or not. In order for a homicide to have been done in the commission of this particular felony, aggravated assault as alleged in the indictment, there must be some connection between the felony and the homicide.

The homicide must have been done in carrying out an unlawful act and not collateral to it. It is not enough that [a] homicide occurred soon or presently after the felony was attempted or committed. There must be such a legal relationship between the homicide and the felony so as to cause you to find a homicide occurred before the felony was at an end or before any attempt to avoid a conviction [or] arrest for the felony.

The felony must have a legal relationship to the homicide, be at least concurrent within a part, and be part of it in an actual and material sense. A homicide is committed in the carrying out of a felony when it's committed by the accused or accused persons while engaged in the performance of any act required for the full execution of the felony.

In addition to its oral charge, the court gave the jury a written copy of the charge and a redacted indictment[5] to take into the jury room during deliberations. Burley voiced no objection to the instructions either before or after the trial court charged the jury.

---

[5] The indictment was redacted to remove counts related to co-indictee Burns.

12

Because Burley failed to object at trial to the instructions he now challenges on appeal, he failed to preserve his claim of error for ordinary appellate review. This Court, however, must review the instructions for plain error. See OCGA § 17-8-58 (b). "[U]nder OCGA § 17-8-58 (b), appellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions." *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011).

This Court established the following test for determining whether there is plain error in jury instructions under OCGA § 17-8-58 (b):

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Kelly*, 290 Ga. at 33 (2) (a) (citation and punctuation omitted;

13

emphasis in original). If one prong of the plain error test is not satisfied, we need not address the other prongs of the test. Id. at 34 (2) (b) n.5. Satisfying this high standard "is difficult, as it should be." (Citation and punctuation omitted.) *Hood v. State*, 303 Ga. 420, 426 (2) (a) (811 SE2d 392) (2018). Consequently, an appellant's "failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that [his or her] claims in this regard will be rejected." *Kelly*, 290 Ga. at 32 (1) n.2.

Burley did not affirmatively waive this issue at trial, so the first prong is met. The second prong is met as well. The trial court's charge failed to accurately instruct the jury on the essential elements of felony murder and aggravated assault as those offenses were set forth in the indictment. See *Anderson v. State*, 309 Ga. 618, 623-624 (3) (847 SE2d 572) (2020) (A "trial judge must charge the jury on each crime specified in the indictment unless the evidence does not warrant a conviction of such crime, or unless the State has affirmatively withdrawn a crime or stricken it from the indictment." (citation and punctuation omitted)). In this case, given that the

State drafted its indictment such that the felony murder count was predicated on the count alleging aggravated assault with intent to murder, the trial court was required to instruct the jury that, in order to find Burley guilty of felony murder as well as the predicate offense, it must find that Burley assaulted Brooks with the specific intent to kill. As this Court has explained, the main difference between felony murder and malice murder is that felony murder does not require proof of malice or intent to kill. See *Guyse v. State*, 286 Ga. 574, 576 (2) (690 SE2d 406) (2010). "Felony murder does, however, require that the defendant possess the requisite criminal intent to commit the underlying felony." *Holliman v. State*, 257 Ga. 209, 210 (1) (356 SE2d 886) (1987). That is because "[p]roof of the elements of the offense of felony murder necessarily requires proof of the elements of the [predicate] felony." *Woods v. State*, 233 Ga. 495, 501 (IV) (212 SE2d 322) (1975). Thus, to support a felony murder conviction in this case, the State was required to prove beyond a reasonable doubt that Burley committed the predicate offense of aggravated assault with intent to murder.

Aggravated assault with intent to murder requires proof beyond a reasonable doubt that the defendant committed a simple assault in one of the two ways defined in OCGA § 16-5-20 (a) and that he acted with the "intent to murder." OCGA § 16-5-21 (a) (1). Murder requires proof of a specific mens rea — malice aforethought, which incorporates an intent to kill the victim.[6] See *Guyse*, 286 Ga. at 576 (2) (discussing elements of aggravated assault); see also *Grant v. State*, 326 Ga. App. 121, 122 (1) (756 SE2d 255) (2014) ("To authorize a conviction for aggravated assault with intent to murder, the State must show that the defendant acted with the deliberate intent to kill at the time of the assault[.]" (citation and punctuation omitted)). In this case, the trial court defined simple assault. And,

---

[6] See OCGA § 16-5-1 (a) ("A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."); OCGA § 16-5-1 (b) ("Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."). See also *Latimore*, 262 Ga. at 450 ("malice incorporates the intent to kill, and may be implied where the facts show that the accused acted with an abandoned and malignant heart, absent a showing of considerable provocation" (citations omitted)).

16

although the court instructed the jury that "[t]he intent to murder is a material element of aggravated assault as charged in this case[,]" it did not define "intent to murder" as requiring a specific intent to kill the victim. Thus, the trial court's charge on aggravated assault with intent to murder was incomplete because it did not fully instruct the jury on an essential element of the offense. See *Guyse*, 286 Ga. at 576 (2); *Grant*, 326 Ga. App. at 122 (1).[7]

Nor did the trial court instruct the jury that "intent to murder"

---

[7] We note that, in the bench notes to the pattern jury instruction for aggravated assault with intent to murder, rape, or rob, the Council of Superior Court Judges of Georgia instructs the trial court to "include the definition of the relevant felony" when charging aggravated assault with such specific intent:

> For aggravated assault, the State must prove that the Defendant:
> 1. assaulted another person
> 2. with the intent to (murder) (rape) (rob).
>
> To prove assault, the State does not have to prove that the other person was actually injured. However, the State must prove that the Defendant (attempted to cause a violent injury to the person) (committed an act that placed the person in reasonable apprehension or fear of immediately receiving a violent injury).
>
> The intent to (murder) (rape) (rob) is an essential element of aggravated assault. (Murder) (Rape) (Robbery) is defined as follows: (define alleged offense).
>
> Bench Notes: You must include the definition of the relevant felony. See 2.10.10 (murder); 2.30.10 (rape) and 2.60.10 (robbery).
>
> Authority: OCGA § 16-5-21 (a) (1).

Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2021), § 2.20.20.

17

is also a material element of the felony murder count as drafted. To the contrary, the court instructed the jury that it could return a verdict of guilty on the felony murder count "whether the homicide was intended or not" so long as it concluded that "the defendant or defendants were engaged in the commission of the felony of aggravated assault." An unintended homicide does not constitute "murder" as that offense is defined in OCGA § 16-5-1 (a).

Given that the court's charge, taken as a whole, failed to instruct the jury that it was required to find that Burley acted with the intent to take the victim's life in order to find Burley guilty of felony murder as drafted and the separately charged predicate offense of aggravated assault with intent to murder, the charge constituted clear and obvious error. See *Anderson*, 309 Ga. at 623-624 (3). Compare *Chase v. State*, 277 Ga. 636, 640 (2) (592 SE2d 656) (2004) (The "failure to inform the jury of an essential element of the crime charged is reversible error because the jury is left without appropriate guidelines for reaching its verdict."), with *Whitaker v. State*, 283 Ga. 521, 525-526 (4) (661 SE2d 557) (2008) ("[T]he trial

18

court's instruction as a whole made plain that the commission of aggravated assault with the intent to murder necessitated the intent to take the life of a human being.").

However, to satisfy the third prong of the plain error test, it is incumbent upon Burley to demonstrate that the erroneous charge affected his substantial rights and affected the outcome of the trial court proceedings. Burley's brief is silent on this point. He appears to assume that an instruction that relieves the State from proving an essential element of the crime charged is presumptively harmful under a plain error analysis. That is not necessarily so. As we have explained, "relieving the State from proving an element of the crime can certainly be harmful error affecting the outcome of a proceeding." (Citation omitted.) *Williams v. State*, 308 Ga. 228, 232-233 (2) (838 SE2d 764) (2020). However, when an appellant fails to carry his burden of showing that such an erroneous instruction actually affected his substantial rights or likely affected the outcome of the trial, the error does not constitute plain error. See id.

In *Williams*, a jury charge relieving the State from proving the

essential element of actual consent in a prosecution for aggravated sexual battery did not constitute plain error because Williams failed to show that the third prong of the plain error test had been satisfied under the circumstances of his case: The victim was four years old when Williams, on several occasions, intentionally penetrated the victim's vagina with his finger. Consequently, even if the jury had been instructed that the State had to prove lack of consent, "no rational juror could have concluded, based on the record presented at trial, that the State had failed to prove that element in this case." 308 Ga. at 233 (2). We reach a similar conclusion concerning the essential element of Burley's criminal intent, given the evidence in this case.

Although there is no direct evidence in the record that Burley intended to kill Brooks, a rational juror likely would have inferred that intent[8] from the overwhelming circumstantial evidence

---

[8] In its charge on intent, the court stated that, "[i]n deciding the question of intent, you may consider all of the facts and circumstances of the case as well as the character of the weapon used and the manner in which it was used, if you find that a weapon was used." Burley contends this charge allowed the

adduced. Most significantly, the forensic evidence concerning the repeated, overlapping, and severe injuries that Brooks sustained as a result of being beaten over a very long period of time is compelling evidence from which a rational juror would infer a specific intent to kill. See, e.g., *Brewer v. State*, 280 Ga. 18, 19 (1) (622 SE2d 348) (2005) (Though the evidence was circumstantial, the jury was authorized to infer from the evidence presented — including forensic evidence that either wound, by itself, was mortal and would have instantaneously rendered the victim incapable of purposeful movement – that the defendant intended to kill the victim by shooting him twice in the head.); *Lord v. State*, 297 Ga. App. 88, 91-

jury to find him guilty of aggravated assault in a manner not charged in the indictment, that is, aggravated assault with a deadly weapon. The court, however, did not charge the jury on alternate methods of proving an aggravated assault. Further, the jury is authorized to infer an intent to kill from the nature of the weapon used, among other things. See, e.g., *Gipson v. State*, 332 Ga. App. 309, 312 (1) (772 SE2d 402) (2015) ("To authorize a conviction for aggravated assault with intent to murder, the State must show that the defendant acted with the deliberate intent to kill at the time of the assault, which the jury may infer from the nature of the instrument used in making the assault, the manner of its use, and the nature of the wounds inflicted." (citation and punctuation omitted)); *Jordan v. State*, 322 Ga. App. 252, 254 (2) (744 SE2d 447) (2013) (Intent may be inferred from all of the circumstances surrounding the assault.).

92 (1) (a), 95 (2) (676 SE2d 404) (2009) ("Intent to kill may be inferred from the nature of the instrument used in making the assault, the manner of its use, and the nature of the wounds inflicted, as well as the brutality and duration of the assault." (citation and punctuation omitted)).

Further, even if the jury had assumed that Adams was the primary assailant, given the presence of Brooks's DNA on Adams's boot, strong evidence shows that Burley was a party to that crime and that he shared Adams's criminal intent.[9] Pursuant to OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime." Although proof of a shared criminal intent with the actual perpetrator is necessary to establish that one is a party to the crime, "shared criminal intent may be inferred from the person's conduct before, during, and after the crime." *Grant v. State*, 298 Ga. 835, 837 (1) (785 SE2d 285) (2016). That Burley participated in the crime is evident from the bloodstains on his clothes and the injuries he

---

[9] The trial court instructed the jury on the law of parties to a crime.

22

sustained on his hands and face during the lockdown. Compelling evidence also existed from which a rational juror likely would have inferred that Burley and Adams shared a specific intent to kill. Both acted to conceal evidence of the crime by blocking the view into his cell when the lockdown ended, cleaning the cell with a bleach solution, and attempting to dispose of clothing and towels that might yield incriminating evidence. And the evidence showed that Burley and Adams were in the same gang and that Smith, their gang leader, had ordered them to kill Brooks. Finally, Burley has not disputed these facts by demonstrating in the argument section of his brief how a rational juror could have concluded from this evidence that the State had failed to prove beyond a reasonable doubt a specific intent to kill Brooks.

Given these circumstances, the instructional error did not constitute plain error. That is because, "even had the jury been instructed that the State had to prove [a specific intent to kill], no rational juror could have concluded, based on the record presented at trial, that the State had failed to prove that element in this case."

*Williams*, 308 Ga. at 232-233 (2). Consequently, the court's erroneous instructions were unlikely to have affected Burley's substantial rights or the outcome of the proceedings. Because Burley failed to satisfy one of the prongs of the plain error test, he has not carried his burden of showing plain error. See *Kelly*, 290 Ga. at 34 (2) (b) n.5. Therefore, we affirm his conviction for felony murder.

*Judgment affirmed. All the Justices concur.*

Decided May 31, 2023 — Reconsideration denied July 5, 2023.

Murder. Calhoun Superior Court. Before Judge Lanier.

*The Steel Law Firm, Brian Steel*, for appellant.

*Joe K. Mulholland, District Attorney, Banks T. Smith, Moruf O. Oseni, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.