NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 21, 2025

S25A0817. BURKS v. THE STATE.

ELLINGTON, Justice.

Rufus L. Burks appeals his convictions for felony murder and other crimes in connection with the death of Caleb Short.[1] Burks

---

[1] The crimes occurred on the night of January 3, 2016. On July 26, 2016, a Muscogee County grand jury returned an indictment charging Burks, Raheam Gibson, and Jervarceay Tapley with malice murder (Counts 1-3); felony murder (Counts 4-6); kidnapping (Count 7); first-degree burglary (Count 8); and theft by taking (Counts 9-10), in connection with the deaths of Caleb and Gloria Short and Gianna Lindsey. At a jury trial that began on February 5, 2018, Gibson and Tapley decided to plead guilty, evidence was presented through February 12, and the jury deliberated from February 13 through February 19, when it found Burks guilty on Counts 6-10, which included the felony murder of Caleb Short (Count 6). The jury was unable to reach a unanimous verdict on the remaining charges, so the trial court declared a mistrial on Counts 1-5, and those counts were subsequently nolle prossed. The trial court entered the final disposition on October 12, 2018, nunc pro tunc to April 6, 2018, and sentenced Burks to life in prison with the possibility of parole for one count of felony murder (Count 6); life in prison with the possibility of parole for kidnapping (Count 7), to run concurrently with Count 6; 20 years in prison for first-degree burglary (Count 8), to run consecutively; and ten years in prison for each count of theft by taking (Counts 9-10), to run concurrently.

Burks filed a motion for new trial on April 9, 2018, which he twice

contends that the evidence was insufficient to support his convictions and that the trial court erred by admitting post-incision autopsy photographs of the deceased, giving an "*Allen*[2] charge" to the jury instead of granting a mistrial, denying Burks's motion for a change of venue based on pretrial publicity, and denying his motion to impanel a new jury after the jurors initially saw Burks alongside his co-defendants during voir dire but later saw only Burks following his co-defendants' decisions to plead guilty. For the reasons explained below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, on January 3, 2016, Burks,

---

amended through new counsel, on October 31, 2019, and March 5, 2020. After a hearing, the trial court denied the motion for new trial on February 24, 2021. On July 23, 2021, the trial court entered an order providing Burks 30 days to file a notice of out-of-time appeal because counsel had not been served with a copy of the trial court's order denying the motion for new trial. Burks then filed a notice of appeal on August 18, 2021, but, in Case No. S24A0524, this Court dismissed his appeal as untimely. On March 14, 2024, the trial court set aside its original order denying the motion for new trial, and, on April 5, 2024, the court re-entered the same. See *Veasley v. State*, 272 Ga. 837, 838-39 (2000); *Cambron v. Canal Ins. Co.*, 246 Ga. 147, 148-49 (1980). Burks then filed a timely notice of appeal on April 22, 2024, and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

[2] *Allen v. United States*, 164 US 492 (1896).

2

Raheam Gibson, Jervarceay Tapley, and Marcus Dermer formed a plan to "do a lick," or burglarize, the house of Tapley's family friend, Caleb Short, where Caleb lived with his mother Gloria Short, Gloria's granddaughter Gianna Lindsey, and Gloria's husband Robert Short. Dermer decided not to join, but the others in the group "met up" later in South Columbus and headed toward the Shorts' residence, with Gibson and Burks riding on Burks's moped and Tapley riding on a bike. At one point, Tapley discarded the bike and walked, and at another point, they "ditched" the moped in the woods, and they all walked the rest of the way. Their approximately three-hour trip to the Shorts' house was confirmed by surveillance video and cell phone record[3] analysis, and they arrived between 10:00 p.m. and 11:00 p.m.

Gibson testified to the following. When the group arrived at the house, they walked up the driveway, and Gibson and Burks followed

---

[3] Phone records also showed that, on the night of January 3, Burks' cell phone had several incoming and outgoing phone calls with his father's cell phone between 9:13 p.m. and 11:35 p.m.

Tapley through the gate to the backyard and around the house to Caleb's window. Tapley called Caleb's cell phone, and Caleb opened his window. Through the window, Tapley told Caleb to come to the house's front door, and Caleb did. When Caleb came out of the front door, Tapley tackled him and pinned him on the ground and asked for help, and Burks helped Tapley. Burks and Tapley took Caleb around to the opposite side of the house to the backyard. When they moved Caleb to the side of the house, they "[s]tarted wrapping him up in tape." Caleb was telling Tapley to "stop playing" around. After they moved Caleb to the backyard, Gibson saw Tapley come from the backyard and go into the front door of the house.

Gibson further testified that he stood outside for approximately 20 or 30 minutes, could not hear anything going on inside the house, and did not see Burks again until they were all leaving. Gibson and Burks went into the garage and got into the Shorts' Volkswagen, which had clothes and about "seven or eight pairs of … Jordan's and Nike's" in shoe boxes in the back seat, and Burks drove back to Columbus with Gibson riding in the passenger seat while Tapley

4

was still in the house. Burks drove the Volkswagen around for a little while until they were able to get in contact with Tapley, who told them where to meet him, and when Burks and Gibson arrived, Tapley was sitting in the driver's seat of an SUV that Gibson had seen parked in the driveway at the Shorts' residence before they left. Burks and Tapley began unloading items from the Volkswagen into the SUV, and Tapley instructed Burks and Gibson to walk to his house. Gibson arrived at Tapley's home sometime around midnight or 1:00 a.m. and saw the clothes that had been taken from the Shorts' house laid out on Tapley's bed.

Robert Short testified to the following. Robert left his house around 6:00 p.m. on January 3 for his overnight work shift. He arrived back at his home after 7:00 a.m. on January 4 and saw his garage door open, his 2004 GMC Envoy and Volkswagen Beetle missing, and the attic stairs hanging down in the garage. He ran inside and found his wife Gloria lying face down in the hallway with her hands taped at the wrist and no pulse. In the living room, he saw his granddaughter Gianna lying face up, also with no pulse, and

he found his son Caleb in a closet lying on his back, also with no pulse. In addition to the two missing automobiles, items missing from his home included Caleb's Jordan shoes, a PlayStation 4, several video games, $400 in collectible coins, a case of wine, and cash.

Law enforcement arrived at the Shorts' residence around 9:00 a.m. on January 4 following Robert's 911 call and discovered the dead bodies of Caleb, Gloria, and Gianna. One crime scene investigator with the Columbus Police Department testified that inside the house, officers found multiple bloodstains, blood spatter, and pools of blood; fragments of broken pot lids; a bloody 20-pound dumbbell next to Gianna's body; bloody shoe prints; an open desk drawer; open phone boxes; a game on the entertainment center but no gaming system or console; one jewelry case with jewelry hanging out of it, another jewelry case with the drawer open, and jewelry on the floor; a glass vase tipped over; a table that had been pushed out of place, a broken chair, and a broken lamp; an open purse and items on the couch; and pieces of duct tape and blue painter's tape.

Another crime scene investigator testified that, in Caleb's bedroom, he found an open window, empty Apple iPhone cases on the bed, drawers pulled out, the room in disarray, and a second 20-pound dumbbell. Photographs entered into evidence depicted the rooms in which the victims were found, showing blood spatter and pools of blood along with debris from various broken items, including a broken teapot covered in blood, a broken lamp, and a broken red pot lid. Officers found Caleb's body in the master bedroom closet with his feet and hands bound by electrical tape, blue painter's tape on other areas of his body, substantial injury to his face and head area, blood pooling from his head, and teeth on the floor. Caleb had dirt and grass stains on his pants and grass stains on his socks, and there were grass and leaves in some of the tape bindings and around his body, suggesting he had been bound outside. Based on Caleb's positioning and the blood spatter around him, it appeared to crime scene investigators that he had been beaten, resulting in a massive loss of blood.

Law enforcement located the stolen vehicles parked

approximately two miles from Tapley's residence and discovered several bags full of clothing and blood scattered throughout the vehicles. Pursuant to a search warrant, officers later executed a search of Burks's residence and located a pair of Caleb's Jordan sneakers.

Marcus Dermer testified that, around 1:00 a.m. on the morning of January 4, Tapley called and said he had "some stuff" for Dermer to pick up. Dermer woke up around 9:00 a.m. that same morning and saw a white trash bag at his door containing multiple pairs of Jordan shoes, T-shirts, and pants, as well as a note that identified the bag's contents as "old clothing." A photo admitted into evidence showed Dermer and Burks wearing various items that belonged to Caleb, with Dermer wearing Caleb's shirt and Burks wearing Caleb's shoes. Dermer testified that prior to January he had never seen Burks in the shoes he was wearing in that photo. Dermer also saw Burks ask on Facebook if anybody had a power cord to a PlayStation, but prior to January, Dermer had never seen a PlayStation at Burks's house.

A cell phone forensics analyst with the Columbus Police Department testified that Facebook messages extracted from Burks's phone pursuant to a search warrant revealed a conversation between Burks's account and another person that took place on January 4, 2016, where Burks asked if the person had a power cord for a PlayStation 4, and when the person replied affirmatively, Burks's account replied "I got a ps4." In another Facebook message on January 4, Burks's account asked Tapley to call him, and when a message from Tapley's account informed Burks that Tapley could not call, Burks told him, "Look on the news." Tapley replied, "I did. Nothing happened. Forget everything bruh. No snitching. No telling anybody what we did. Straight up." Another person testified that Burks organized, via a series of Facebook messages, an exchange of PlayStation 4 video games and that Burks drove a moped to the exchange on January 5.

2. Burks contends that the evidence was insufficient to support his convictions as a matter of constitutional due process for felony murder, kidnapping, burglary, and theft by taking. Burks argues

9

that there was "insufficient evidence to support [his] conviction of Count 6, Felony Murder" because he never entered the residence and because the Facebook and cell phone evidence showed that he remained outside of the residence the entire time.[4] He argues that none of Caleb's possessions were found at his residence, that Burks's DNA was not found in the stolen vehicles, that there was no evidence that he moved Caleb's body, and that there was no evidence that he actively participated in the crimes.[5] For the reasons explained below, Burks's claim fails.

When this Court evaluates a challenge to the sufficiency of the evidence, "we view all of the evidence presented at trial in the light

---

[4] Burks also argues that the State failed to prove that he acted with malice aforethought and, thus, the evidence was insufficient to prove that he was guilty of "[m]alice murder, one of the charges against" him. But the jury did not find Burks guilty of any of the malice murder counts, and as such, any argument about the malice murder charges is moot following the dismissal of those counts. See OCGA § 16-5-1(a) (requiring a person who commits malice murder to have acted "with malice aforethought"). See also *Burley v. State*, 316 Ga. 796, 803 (2023) ("[T]he main difference between felony murder and malice murder is that felony murder does not require proof of malice or intent to kill." (citation omitted)).

[5] We note that Burks was convicted only of the felony murder of Caleb. The counts charging him with the felony murders of Gloria and Gianna were nolle prossed after the jury could not reach a verdict as to those counts.

10

most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304 Ga. 594, 598 (2018) (citing *Jackson v. Virginia*, 443 US 307, 318-19 (1979)). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Davis v. State*, 316 Ga. 418, 420 (2023) (citation and quotation marks omitted).

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1(c). From the statutory language of OCGA § 16-5-1(c), "our decisional law has identified certain related prerequisites the State must establish to convict a defendant of felony murder." *Eubanks v. State*, 317 Ga. 563, 568 (2023). First, the underlying felony must have been "inherently dangerous," in that the underlying felony was one from which it was reasonably foreseeable that death could result. Id. Second, the defendant's conduct must have been the "proximate cause" of the

11

death, i.e., the death must have been the "probable or natural consequence" of the defendant's conduct. Id. And third, the death must have been caused "in the commission of" the predicate felony. Id. Further, felony murder "require[s] that the defendant possess the requisite criminal intent to commit the underlying felony." *Burley*, 316 Ga. at 803 (citation and quotation marks omitted). "That is because proof of the elements of the offense of felony murder necessarily requires proof of the elements of the predicate felony." Id. (citation, punctuation, and quotation marks omitted).

The crime of aggravated assault, as charged in the indictment, is committed when a person assaults another with an object which, when used offensively against a person is likely to result in serious bodily injury. See OCGA § 16-5-21(a)(4); see also *Stroud v. State*, 318 Ga. 744, 749 (2024) ("Felony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony—in this case, aggravated assault, which also does not require intent to kill.").

"Every person concerned in the commission of a crime is a party

12

thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20(a). To convict someone as a party to a crime, the State must show "that he intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes." *Stroud*, 318 Ga. at 749 (citation and quotation marks omitted). Criminal intent is a question for the jury and "may be inferred from that person's conduct before, during, and after the commission of the crime." *Poole v. State*, 312 Ga. 515, 519 (2021) (citation and quotation marks omitted). "[M]ere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, [but] criminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." Id (citation and quotation marks omitted).

Here, Burks contends that, as a matter of constitutional due process, the evidence was insufficient to show that he was guilty beyond a reasonable doubt of felony murder. The evidence presented at trial, however, was sufficient as a matter of constitutional due

process to conclude that Burks was guilty of felony murder, at least as a party to the crime. To that end, the evidence showed that Tapley told Burks and Gibson his plan to burglarize the Shorts' residence, Burks and Gibson traveled alongside Tapley for nearly three hours to the home, and Burks acted in concert with Tapley to carry out his plan to burglarize the home. Although it is true that the phone records show that, at various times between 9:13 p.m. and 11:35 p.m. on January 3—a timeframe that overlaps with when Gibson testified that the group was present at the Shorts' residence—Burks was making and receiving phone calls, Gibson testified that Burks helped Tapley bind Caleb with tape and move him through the grass to the other side of the home. Caleb was found with severe blunt force trauma to the head and significant pooling of blood around him in the bedroom closet. The photographs entered into evidence showed extensive amounts of debris, with broken pot lids and other broken and bloodied items strewn across the house, and the medical examiner testified that Caleb died from blunt force trauma to the head. From this evidence, a reasonable jury could have inferred that

Burks acted in concert with Tapley to commit the crime of aggravated assault against Caleb and, thus, there was sufficient evidence to support the jury's finding that Burks was guilty of felony murder beyond a reasonable doubt as a party to a crime. See OCGA § 16-2-20(a); *Stroud*, 318 Ga. at 749.

Likewise, there was sufficient evidence from which a reasonable jury could have found Burks guilty beyond a reasonable doubt as to the kidnapping, burglary, and theft by taking counts. As to the kidnapping of Caleb, Gibson testified that Tapley and Burks forcefully took Caleb to the other side of the house and bound him using duct tape. "A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will." OCGA § 16-5-40(a). Law enforcement found Caleb bound at the hands and feet with tape that had pieces of grass and leaves stuck to the tape, indicating that he had been bound outside and moved into the house where he was ultimately found dead. Thus, the evidence at trial was sufficient to support Burks's conviction for

15

kidnapping Caleb.

The evidence was also sufficient for a reasonable jury to convict Burks for first-degree burglary. "A person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another…." OCGA § 16-5-1. Gibson testified that he, Tapley, and Burks made plans to "do a lick," or burglarize, the Shorts' home. He also testified that he and Burks entered the garage of the Shorts' home to take the Volkswagen, stolen items from the Shorts' home were found in Burks's residence, and Burks sold PlayStation 4 video games, was asking if anyone had a PS-4 power cord online, and told someone that he "got a ps4" in the days following the crimes. Thus, the evidence at trial was sufficient to show that Burks was a party to this crime and to support his conviction for first-degree burglary.

Lastly, the evidence was sufficient for a reasonable jury to find Burks guilty of theft by taking of the two vehicles. "A person commits the offense of theft by taking when he unlawfully takes or,

16

being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." OCGA § 16-8-2. Gibson testified that he and Burks left the home in the Shorts' Volkswagen and later met up with Tapley, who was in possession of the other stolen vehicle which had been taken as part of the group's common criminal scheme, before the vehicles were eventually found near Tapley's residence. Burks contends that there was no physical evidence such as hair, blood, or fibers of his collected from the car, but the State "was not required to produce any physical evidence." *Jackson v. State*, 307 Ga. 770, 772 (2020) (citation and quotation marks omitted). "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." Id. (citation and quotation marks omitted). Burks physically took the Volkswagen from the Shorts' garage and was part of the group that planned to "do a lick" of the Shorts' home, which included the theft of the GMC Envoy, such that a reasonable

17

jury could find Burks guilty of the theft of both vehicles as a party to the crime. Accordingly, the evidence was sufficient to support Burks's convictions for theft by taking of both vehicles.

3. Burks next contends that the trial court abused its discretion in admitting post-incision autopsy photographs of the victims over his objection because they were more prejudicial than probative under OCGA § 24-4-403 ("Rule 403"). Because the post-incision photographs helped the medical examiner explain the nature and extent of the injuries that led to the death of the victims, their probative value was not substantially outweighed by the danger of unfair prejudice under Rule 403, and the court did not abuse its discretion in admitting the photographs.

While the medical examiner was on the stand, outside of the jury's presence, the parties discussed which autopsy photographs would be admitted, and Burks objected to the post-incision photographs, arguing that the amount of trauma and amount of blood loss were apparent from the crime scene photos and that they were more prejudicial than probative. On voir dire, the medical

18

examiner, Dr. Natasha Grandhi, testified that the ten post-incision photographs in question depicted blunt force trauma that would be potentially fatal, skull fractures, and the trauma associated with the fractures that could contribute to the cause of death. Dr. Grandhi explained that fractures of enclosed spaces could cause changes in pressure, trauma to underlying organs, brain bleeding, or blood loss, which could all contribute to potential causes of death, and that some of these photographs showed bone displacement that changes the environment of the brain and could potentially cause death of cells. The medical examiner confirmed that these photographs were necessary for her to adequately explain to the jury the nature of the injuries and resulting effect of those blunt force traumas. The trial court admitted the post-incision photographs over Burks's objection.

Back in the jury's presence, Dr. Grandhi testified that Exhibits 356 and 357, two of the post-incision photographs from Caleb's autopsy, showed areas of bleeding within the scalp and extensive fractures and that some of the fractures were comminuted, meaning that the skull broke into separate pieces with some pieces still

19

adhered to the scalp while other pieces had become dislodged and had gone into the underlying brain tissue, demonstrating significant enough trauma to cause damage to that tissue. Based on the autopsy, Dr. Grandhi determined the cause of death to be multiple blunt force injuries.

Burks argues that, under the Rule 403 balancing test, the post-incision autopsy photographs unduly prejudiced him because they were gruesome and were not necessary to show anything about the cause of death that the pre-incision photographs had not already shown or to rule out other potential causes of death.

"In general, the admissibility of autopsy photographs is governed by OCGA §§ 24-4-401, 24-4-402, and 24-4-403." *Johns v. State*, ___ Ga. ___, ___ (2025), S25A0875, slip op. at 11 (Ga. Aug. 12, 2025). An autopsy photograph is relevant evidence if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," OCGA § 24-4-401, and a relevant autopsy photograph is generally admissible as evidence, see OCGA

20

§ 24-4-402. However, such a photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. "In reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Salvesen v. State*, 317 Ga. 314, 317 (2023) (citation and quotation marks omitted). "Decisions regarding relevance are committed to the sound discretion of the trial court, and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Albury v. State*, 314 Ga. 459, 461 (2022) (citation and quotation marks omitted). "Autopsy photographs may be relevant and probative to show the nature and location of a victim's injuries, even if the cause of death is not disputed." Id. (citation and quotation marks omitted).

In this case, the post-incision photographs were relevant to

illustrate Dr. Grandhi's testimony about Caleb's cause of death, as they showed areas of bleeding under the scalp, underlying brain tissue damage, and the extent of the skull fractures that were not visible pre-incision. Thus, the photographs were relevant to show the nature and location of the injuries and "corroborated the State's evidence of the circumstances of the killing." *Moore*, 307 Ga. at 295 (citation and quotation marks omitted). See also *Albury*, 314 Ga. at 461. Moreover, the probative value of the photographs was high because they visually depicted some of the considerations the medical examiner made when determining the cause of death, and "although the photographs may have been graphic, we cannot say the trial court abused its discretion in concluding that their probative value was not substantially outweighed by the danger of unfair prejudice." *Johnson v. State*, 316 Ga. 672, 683 (2023). See also *Salvensen*, 317 Ga. at 317 ("[T]he mere fact that the photographs were gruesome does not, as a general matter, render them inadmissible under Rule 403."). The trial court did not abuse its discretion by admitting into evidence the post-incision autopsy

22

photographs at issue here. See *Flowers v. State*, 307 Ga. 618, 624 (2020) (holding that the trial court did not abuse its discretion in admitting an autopsy photograph that showed "the underside of [the victim's] brain, to illustrate the extent of the bruising," and that was relevant evidence of the severity of that immediately lethal injury).

4. Burks next contends that the trial court erred in providing the jury with an *Allen* charge instead of granting a mistrial when the jury informed the court it could not reach a unanimous decision. But because there was nothing coercive about the *Allen* charge provided, we disagree.

The jury began deliberations on February 13, 2018. On February 14 and again on February 15, jurors sent notes to the court indicating that one or more jurors were having trouble participating in deliberations. The court suggested providing a charge pursuant to *Allen v. United States*, 164 US 492 (1896), but the State suggested it may be too soon for an *Allen* charge. The foreman sent a note that stated "2 jurors suggests that we have reached an impasse. I do not agree," and told the court that he believed the jury needed to keep

deliberating. The court instructed them to keep deliberating. Later on February 15, the foreman told the court that the jury had reached a verdict on three counts. The State asked the court for the *Allen* charge for the others, but the court declined. At 4:10 p.m. on February 15, the jury sent a note that "reflect[ed] where [it stood] on the 10 counts," and showed a tally of how jurors were leaning as to each count. The court told the parties that there was unanimity as to Counts 6, 7, and 8. The court instructed the parties to consider an *Allen* charge for the following day.

On February 16, the State argued that the jury may be at an impasse and that the court should give an *Allen* charge. Burks objected and stated that a mistrial might be more appropriate. At 9:45 a.m., the jury sent a note stating that it had taken a "final vote," and provided to the court the breakdown of its vote on all counts. The court told the parties that the vote showed that there had been changes on two of the counts from the previous day's tally, but the foreman told the court that the jurors were at an impasse on all counts other than the three on which they had reached a unanimous

24

verdict the day before. The court asked the foreman if he believed the jury was at an impasse as to the seven counts for which there was not already a unanimous verdict, and the foreman responded, "Sir, I believe we are at an impasse on all of them."

The court then provided an *Allen* charge,[6] to which Burks

---

[6] The charge largely mirrored the 2016 pattern jury charge, as the court instructed the jury:

> And at this time, I'm going to remind you that your verdict must be unanimous. You have been deliberating this case for a considerable length of time and I do deem it proper to give you further instruction regarding the desirability of agreement if possible.
>
> This case has been exhaustively and carefully tried by both sides. It has been submitted to you for decision and a verdict if possible rather than for disagreement. It is the law that a unanimous verdict is required. While this verdict must be the conclusion of each juror and not a mere acquiescence in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and the questions submitted with candor and fairness and with a proper regard for and deference to the opinion of the other jurors.
>
> Each juror should listen to the arguments of the other jurors with a disposition to be convinced by them. If you differ in your views of the evidence, such difference of opinion should cause you to scrutinize the evidence more closely and to re-examine the grounds for your own opinion.
>
> Your duty is to decide the issues of fact that have been submitted to you if you can do so conscientiously. In conferring, you should lay aside all mere pride of opinion and you should bear in mind that the jury room is no place to champion either side of a cause. As jurors, you should not be advocates. The aim to keep in

objected. See Ga. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, 4th ed. (2007) (Jury (Hung)) (January 2016 Updates). At 4:10 p.m. on February 16, the foreman sent another note with another breakdown of the votes, indicating a change in tally on five of the seven still-nonunanimous counts, and the foreman confirmed to the court that he thought further deliberation could be fruitful on some, but not all, of the remaining counts.

Following the weekend, the jury resumed its deliberations at 8:45 a.m. on February 19. At 10:16 a.m., the foreman informed the court that they were "making progress," and at 11:02 a.m., the foreman sent another vote tally indicating movement on one count but nothing else. At 11:56 a.m., the jury sent another note that indicated there was unanimity as to Counts 6-12, and Burks's counsel argued that the trial court was "pressuring" the jury into a

mind is the truth as it appears from the evidence examined in light of the court's instructions.

You will again retire to your jury room to resume your deliberations and examine your differences in a spirit of fairness and try to arrive at a verdict.

vote. Later in the afternoon, the foreman indicated that there had been no further movement. The court instructed the foreman to fill out the verdict form for only the counts as to which the jury had a unanimous verdict and to leave blank any count for which there was not a unanimous verdict. The jury found Burks guilty of Counts 6-10, and the court declared a mistrial as to Counts 1-5.

"The decision of whether to give an *Allen* charge is within the discretion of the trial court, and a trial court's instruction is not coercive simply because the instruction compelled the jury to continue deliberating after it reported a deadlock." *Hughs v. State*, 312 Ga. 606, 613 (2021) (citations and punctuation omitted). "The central inquiry in reviewing an *Allen* charge is whether the instruction is coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." *Scott v. State*, 290 Ga. 883, 888 (2012) (citation and quotation marks omitted). This Court considers various factors to determine whether requiring further deliberations was coercive, including:

the length of trial, the length of deliberations before the jury indicates that it is deadlocked, the language of the jury's notes, the progress of the jury, the language of the *Allen* charge and other instructions regarding deliberations, the length of additional deliberations after the alleged coercion, whether the jury found the defendant not guilty of any charges, and the polling of the jury.

*Smith v. State*, 302 Ga. 717, 721 (2017).

Here, the court did not abuse its discretion in charging the jury to continue deliberations because the "*Allen* charge read by the trial court was an accurate statement of the law and not coercive." See *Hughs*, 312 Ga. at 614 (approving the pattern *Allen* charge that is substantially identical to the *Allen* charge given in this case). As to the "language of the jury's notes" and the "progress of the jury" factors, after the first time the foreman volunteered the jury's numerical breakdown on some of the counts for which they did not have a verdict, the numerical breakdowns[7] continued to shift on a

---

[7] At one point during deliberations, the trial court suggested that it may not be appropriate for the parties to know the breakdown of the votes, and Burks agreed, arguing that "one reason we don't engage in those discussions is because we have to make other decisions as far as moving for a mistrial, partial verdict, dismissing jurors for cause or, you know, anything that comes up. And

few of the counts each time the court instructed the jury to continue its deliberations. See *Smith*, 302 Ga. at 721. The foreman reported that he believed the jury could benefit from further deliberations. See id. ("[T]he jury did not simply announce that it was 'deadlocked.' Rather, the jury reported its numerical division and the lack of continued participation by one juror … and described its position with the terms 'stalemate' and 'dilemma.'").

As to the "the language of the *Allen* charge and other instructions regarding deliberations" factors, see *Smith*, 302 Ga. at 721, the court here gave an instruction that largely mirrors the 2016 pattern jury instruction for a hung jury, and Burks has failed to identify any language in the charge amounting to impermissible coercion. See *Scott*, 290 Ga. at 888. See also *Drayton v. State*, 297

that information would influence some of those decisions."

Even though Burks does not raise a claim on appeal about the impropriety of the jury reporting votes or that it was error for the court to reveal the numerical breakdowns of the jurors' votes, we note that, for the very reason argued during deliberations in his trial, "it would have been much better for the trial court to tell the jurors to stop revealing the nature of their numerical division, … and we again encourage trial judges to inform jurors not to reveal that information." *Smith*, 302 Ga. at 722 (citation and quotation marks omitted).

Ga. 743, 747-48 (2015). Burks specifically argues that the court's instruction suggested that, if any juror was the only one to hold a specific view, he or she should consider changing his opinion, and that the instruction gave the "exhausted jurors" the impression that if they did not reach a unanimous decision, they could not go home. We disagree.

To that end, in analyzing an instruction almost identical to the one at issue in this case, this Court has previously held that the modified pattern *Allen* charge would not have impermissibly suggested that the "jurors were absolutely required to reach agreement on each charge as opposed to deadlocking on one or more charges." See id. at 749. In *Drayton*, the appellant alleged that the part of the pattern jury charge instructing that a unanimous verdict was required misled the jury into thinking there had to be either a guilty or a not guilty verdict as opposed to the third option of no verdict resulting in a mistrial. Id. at 748. But we held that that part of the instruction was a correct statement of the law and that the other language from the charge indicated there was a possibility of

30

a third option. Id. at 749.

Specifically, language in the instruction such as "the desirability of agreement, *if possible*," "this verdict must be the conclusion of each juror, and *not a mere acquiescence*," and informing the jury that it was being sent back to the jury room "*to try* to arrive at a verdict" all worked together to keep the jurors from being misled by the part of the instruction that a verdict must be unanimous. Id. (emphasis added). Each of those phrases from the charge given in *Drayton* was included in the instruction the trial court provided in Burks's case and, therefore, we cannot say that the instruction here misled the jurors into thinking that if they did not reach a unanimous verdict they could not go home. Accordingly, Burks has not shown that anything about the instruction given in this case was coercive, and the court did not abuse its discretion in giving the *Allen* charge.

5. Burks next contends that the trial court abused its discretion by denying his motion for a change of venue because the pretrial publicity created an "inherently prejudicial trial setting."

31

But because Burks has not shown how the pretrial publicity rendered his trial setting inherently prejudicial, the court did not abuse its discretion in denying his request for a change of venue.

In August 2016, Burks filed a motion for a change of venue pursuant to OCGA § 17-7-150,[8] arguing that the crimes for which he was charged garnered "an extraordinary amount of pretrial publicity" in Muscogee County and the Chattahoochee Judicial Circuit and engendered "community sentiment" and prejudice due to their "heinous nature." Over a year and a half later, he renewed the motion, arguing that the pretrial publicity had severely prejudiced him, as certain news articles contained inaccurate information and used sensational language. He listed 24 headlines of articles about the crimes and argued that the articles labeled Burks in unflattering terms like "suspect." Following argument, the trial court denied Burks's motion.

---

[8] OCGA § 17-7-150 provides: "The defendant, in any criminal case in which a trial by jury is provided, may move in writing for a change of venue, whenever, in the defendant's or defense counsel's judgment, an impartial jury cannot be obtained in the county where the crime is alleged to have been committed." OCGA § 17-7-150(a)(1)(A).

"The trial court has the discretion to grant a change of venue and its discretion will not be disturbed absent an abuse of that discretion." *Powell v. State*, 297 Ga. 352, 354 (2015) (citation and quotation marks omitted). For a request of a change of venue to be granted, the movant must show either that the trial setting "inherently prejudicial" or "that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Garcia-Solis v. State*, 320 Ga. 754, 760 (2025). To show that a trial setting is inherently prejudicial, "the record must establish that the publicity contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." Id. (citation and quotation marks omitted). And "even in cases of widespread pretrial publicity, situations where publicity has rendered a trial setting inherently prejudicial are extremely rare." *Clements v. State*, 317 Ga. 772, 791 (2023) (citation and quotation marks omitted).

Here, Burks has made no showing that the jury selection process showed actual prejudice to a degree that rendered a fair trial

impossible and argues only that the setting of the trial was inherently prejudicial. Burks, however, has failed to demonstrate how pretrial publicity surrounding his case resulted in an inherently prejudicial trial setting. To support his claim, Burks points to a single comment from a member of the public posted online in response to an online news article about the case to support his claim.[9] Even assuming that an online comment of this kind can be considered in evaluating pretrial publicity or community sentiment, Burks has failed to show that this solitary opinion from an online commenter rendered the publicity itself to be "unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." See *Garcia-Solis*, 320 Ga. at 760. See also *Clements*, 317 Ga. at 791-92 (concluding that there was no inherent prejudice even where local newspaper with articles about the crimes had a print subscription base of 17,500 people and published articles on its

---

[9] The online news article explained that police had identified Burks as the "15-year-old boy charged" with the deaths, and the online commenter responded that neither Burks nor the other two people charged were men but, rather, were "lower than animals!"

Facebook account with 30,000 followers because none of the articles were unduly extensive, factually inaccurate, inflammatory, or reflective of an atmosphere of hostility). See also *Taylor v. State*, 303 Ga. 624, 628-30 (2018) (holding that press coverage did not create presumption of prejudice where one article discussed the victim's widow's dismay with the defendant being retried but the article did not indicate that the public shared the widow's views and was not "otherwise hostile toward the defendant"). Burks has failed to show that the trial setting here was inherently prejudicial, and accordingly, the trial court did not abuse its discretion in denying the motion for a change of venue.

6. Finally, Burks contends that the trial court abused its discretion by denying his oral motion to impanel a new jury during jury selection on the ground that the venire of potential jurors was prejudiced because it initially saw Burks on trial with his co-defendants but, after Gibson and Tapley decided to plead guilty, Burks was the only remaining defendant on trial. We disagree.

After the jury selection process began, Burks's co-defendants

indicated their intent to plead guilty and exited the case. Burks moved for a new jury panel, arguing that the panel would be prejudiced because it would only see Burks remaining at the defendants' table. The court denied the motion because any concerns could be addressed through the court's instructions to the jury to consider only the case against Burks. The court later instructed the jury to decide the case based solely on the evidence presented in the courtroom, reminded the jury that Burks was the "only defendant on trial before [it]," and instructed that the jury was only concerned with guilt or innocence "of this defendant," and the jurors affirmed by oath that they would try the issues formed by the indictment against Burks and according to the evidence presented.

We review a trial court's denial of a motion requesting that a jury panel be excused and another panel be made available for an abuse of discretion. *Horton v. State*, 310 Ga. 310, 318 (2020)."[T]he appropriate inquiry is whether the conduct in question was inherently prejudicial and deprived [the defendant] of his right to begin his trial with a jury free from even a suspicion of prejudgment

36

or fixed opinion." Id. (citation, punctuation, and emphasis omitted). "Of course, where the facts establish only gossamer possibilities of prejudice, prejudice is not inherent." Id. (quotation marks omitted).

Here, the trial court did not abuse its discretion in denying Burks's motion to strike the jury panel. We cannot say that the jury's awareness that Burks's co-defendants were involved in the case at the beginning of jury selection[10] but were ultimately not tried with Burks was "inherently prejudicial." See *Horton*, 310 Ga. at 318. Nor did it deprive Burks of his right "to begin his trial with a jury free from even a suspicion of prejudgment or fixed opinion." Id.

Further, in its preliminary instructions to the jurors, the trial court instructed that the jurors must decide the case based solely on the evidence presented in the courtroom and must not do any research during the trial about the matters or the parties involved in the case. In its jury instructions at the conclusion of the trial, the

---

[10] Albeit in a slightly different context than we have here, the Court of Appeals has held that it was reversible error for a co-defendant to take a guilty plea in the presence of the entire jury panel from which the jury was to be selected. See *Hayes v. State*, 136 Ga. App. 746, 746 (1975). We express no opinion as to the correctness of that holding.

court reminded the jury that "Mr. Burks is the only defendant on trial," and that the jury was only to be "concerned with the guilt or the innocence of this defendant." See *Horton*, 310 Ga. at 317, 319 (concluding that the court did not abuse its discretion when countering the potential effects of an allegedly prejudicial event by inquiring whether the jurors could remain impartial and instructing them to disregard the incident and only decide the case based on the evidence presented). "We ordinarily presume that jurors follow such instructions without clear evidence to the contrary, which we do not have here." *Prickett v. State*, 314 Ga. 435, 440 (2022) (citation omitted).

Burks has provided no evidence to suggest that the change in composition at the defendants' table from the beginning of jury selection to the start of trial prevented Burks from beginning "his trial with a jury free from even a suspicion of prejudgment or fixed opinion," and because "the trial judge was in a better position than this Court to determine the nature of the [allegedly prejudicial event] and its likely effect, if any, upon the jury," we will not disturb

that determination absent an abuse of discretion. See *Horton*, 310

Ga. at 317-18 (citation, punctuation, and quotation marks omitted).

*Judgment affirmed. All the Justices concur.*