NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 16, 2024

S24A0069.  STROUD v. THE STATE.

McMILLIAN, Justice.

Richard Stroud, Jr., was convicted of felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of Frederick Cade.[1] Stroud

---

[1] Frederick Cade was shot on the night of August 13-14, 2017. Stroud and Jarvis Lamont Milton were indicted by a Wilkes County grand jury on February 4, 2019, individually and as parties to a crime and co-conspirators, on charges of violating the Street Gang Terrorism and Prevention Act (Count 1), malice murder (Count 2), felony murder based on aggravated assault (Count 3), possession of a firearm in the commission of a crime (Count 4), and aggravated assault (Count 5). After Milton's case was severed, Stroud was tried before a jury in November 2019, and he was acquitted on Count 2 but found guilty on Counts 3, 4, and 5. Count 1 was nolle prossed before trial. The trial court sentenced Stroud on Count 3 to life in prison with the possibility of parole and on Count 4 to five years in prison, to run consecutively to Count 3. Count 5 was merged into Count 3 for sentencing. Milton was tried separately in May 2019, and his appeal is before this Court as Case No. S24A0068.

Stroud filed a motion for new trial on November 12, 2019, which was amended by new counsel on July 21, 2022. On July 20, 2023, the trial court denied Stroud's motion as amended. Stroud filed a notice of appeal on May 1, 2023, and an amended notice of appeal on August 8, 2023. This appeal was

appeals from his convictions, asserting that (1) the State did not present sufficient evidence to support his convictions beyond a reasonable doubt and (2) the trial court should have granted his motion for a directed verdict. For the reasons that follow, we affirm.

1. The evidence at trial showed that in August 2017, Cade was married to Shakevia Graves, who had a son, D.G., with Stroud. Stroud's co-indictee, Jarvis Lamont Milton, had been dating Shakevia's twin sister, Shanevia ("NeNe") Graves, for six to seven years.[2] Shakevia and Cade's marriage was volatile. The two would often argue, and their arguments would sometimes turn physical. As a result, Shakevia often stayed at her grandparents' house, which was where NeNe lived at the time. NeNe testified that there was friction between Cade and Stroud because Cade did not like that Shakevia "cheated" on him with Stroud. Shakevia said that the two

docketed to the term of this Court beginning in December 2023 and submitted for a decision on the briefs.

[2] Because the Graves sisters' names are so similar and to avoid confusion, we will refer to Shakevia by her full name and Shanevia by her nickname, "NeNe," which is how counsel and witnesses primarily referred to her during trial.

men argued about Stroud's lack of support of D.G. because Cade took care of the child and chastised Stroud for not doing his part.

On Sunday, August 13, 2017, Cade and Shakevia were not getting along, and she was staying at her grandparents' house. That night, Shakevia and NeNe decided to drive to a nearby pool hall. While they were parked there, NeNe saw Cade's truck driving over a railroad track near the pool hall. NeNe alerted Shakevia, and the sisters sped off, with Shakevia driving. Cade followed them, and both vehicles drove through the neighborhood until Shakevia pulled into her grandparents' house. Cade pulled behind the sisters' car but did not get out and instead drove away.

NeNe and Shakevia stayed outside, and NeNe called Milton to come over. Stroud drove Milton to the grandparents' house in Stroud's car. After their arrival, NeNe got into the back of Stroud's car. While Shakevia was approaching the car, Cade suddenly appeared and rushed her from behind. Both Shakevia and Cade ended up inside the backseat of Stroud's car, fighting over the fact that Shakevia was with Stroud. NeNe got out of the car because

Cade and Shakevia were fighting "on top" of her. Shakevia exited the car behind NeNe and ran to the porch of the house with Cade following her. NeNe testified that as this altercation was occurring, Stroud and Milton were upset about Cade's actions, and there was "a small argument," but no one was "passing licks." Milton and Stroud jumped out of the car, and Stroud argued with Cade about his fighting with Shakevia in front of her grandmother. Shakevia testified that as Stroud escorted Cade out of the yard, still talking to him, she heard Milton yell and saw him pull out a gun. When Cade walked away, the altercation ended, and Shakevia went inside the house. Stroud, Milton, and NeNe returned to the car. Shakevia testified that the three then drove away in Stroud's car in the direction opposite from where Cade was walking. Shakevia stayed behind and began repeatedly calling and texting Cade's cell phone but never got a response.

NeNe testified that after she, Stroud, and Milton left the house, the three planned to stop at a nearby house so that she could buy a cigar. But as they were driving there, they saw Cade walking on the

4

other side of the road. Stroud's car windows were down, and when Cade yelled to Stroud, Stroud and Milton began to argue with Cade. NeNe said they were initially just "hollering and yelling." However, Stroud stopped the car, and Stroud and Milton got out. Cade immediately hit Stroud, and a fight ensued. NeNe was upset and stayed in the car. Cade and Stroud were fighting off the side of the road in the mud, but NeNe testified that Milton stood outside the car right next to her during the fight. NeNe then heard a loud gunshot. Stroud ran back to the car, got in, and said, "Bro, I done f**ked up[;] we got to get the f**k on." NeNe testified that when Stroud got back in the car, his shirt was off and he was bare- chested. NeNe never saw a gun, but she saw Stroud put his shirt between his legs on the floor of the car. Stroud, Milton, and NeNe drove off, and the men took NeNe back to her grandparents' house. Shakevia confirmed that NeNe returned home, upset, about one hour after she left with Stroud and Milton. NeNe yelled at Shakevia that Shakevia was "stupid" for calling Cade's phone while "they was fighting." When Shakevia asked what happened, NeNe did not answer, but

said, "You and everybody else will know what happened to him tomorrow."

Cade's body was discovered early on the morning of August 14, 2017, lying on the pavement in a dark, isolated area near the grandparents' house. Attending medical personnel and law enforcement investigators observed that Cade appeared to have suffered at least one gunshot wound to the arm and that he also had an injury to his torso. Emergency medical services personnel called to the scene detected no signs of life. Law enforcement investigators also observed that Cade's body and clothing were muddy. The investigators also discovered muddy shoe prints and a blood trail beginning near a muddy area on the side of the road where one investigator said it looked "like something had happened." The blood trail ended at the body, suggesting that Cade had traveled for some distance before collapsing to the pavement. Samples taken from the blood trail on the roadway were later determined to match a sample of Cade's blood collected during his autopsy.

Later that morning, Shakevia was questioned by Georgia

Bureau of Investigation ("GBI") Agents Austin Bradshaw and Derrick Glasco. Her responses led the agents to NeNe, Stroud, and Milton. Agent Bradshaw said that, at first, NeNe was "not very truthful."[3] As NeNe admitted at trial, she first told the agents that she had not left the house that night, and she did not mention Stroud or Milton. It took some time before NeNe admitted that Stroud and Milton were at the grandparents' house and before she told them that Milton shot Cade. NeNe said that she identified Milton as the shooter after Agent Bradshaw told her that she was "going down the road for this" and she needed "to say something." However, Agent Bradshaw testified that he just told NeNe how serious it was for her to be involved in a homicide investigation and that lying to him was not in her best interest. Afterward, NeNe immediately said "Jarvis [Milton] shot Pooh," which was Cade's nickname.[4]

In her testimony at trial, NeNe denied that after she, Stroud,

---

[3] Agent Bradshaw read NeNe her rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966), "out of an abundance of caution" because she was not being truthful.

[4] NeNe's interviews were recorded, but the recordings were not played at trial.

and Milton left her grandparents' house, they followed Cade. Instead, she said that the three were heading to buy a cigar when they just happened upon Cade. However, NeNe admitted that she "probably" told the GBI agents in her interview that Stroud and Milton followed Cade and that she told the agents that Stroud said, "F**k it, let's beat him up." Agent Bradshaw, who interviewed NeNe, highlighted certain other areas where her interview diverged from her trial testimony. He recounted that NeNe also told investigators that Stroud stopped the car, and after he and Milton exited the car, they both got into a physical altercation with Cade. She also told them that she heard a gunshot shortly before both men got back into the car and that as they drove off, they passed Cade, clutching his right arm, which she demonstrated to the agents in her interview. NeNe also acknowledged at trial that she told the GBI agents that after the gunshot, Stroud said, "Damn, bro, *you* f**ked up," evidently referring to Milton, not "*I* f**ked up" as she testified at trial.

Agent Bradshaw testified that, after he interviewed both

8

sisters that morning, he went back to the crime scene to view it in the daylight. While at the scene, near an area on the side of the road where it looked like an altercation had occurred and where the blood trail and muddy shoe prints began, he discovered a gold pendant "like you wear on a necklace." Investigators later discovered a photo of Stroud on his Facebook page wearing a very similar pendant necklace.

Agent Bradshaw interviewed Stroud the morning that Cade was found.[5] For approximately an hour, Stroud denied having any knowledge of what happened to Cade. But Agent Bradshaw noticed that, like Cade's body, Stroud had dried mud all over his clothing.[6] Bradshaw then obtained Stroud's consent for a search of his car, where investigators located mud and blood smears inside the vehicle. A blood smear located on the vehicle's center console was later determined to match Cade's blood sample. After Agent

---

[5] Before the interview, Agent Bradshaw read Stroud his *Miranda* rights, and Stroud signed a waiver of rights form.

[6] Bradshaw also took pictures of Stroud at the time of his interview, which showed that his clothing was covered in mud and dirt.

Bradshaw reported back to Stroud that blood and mud was found in his car, Stroud eventually admitted that he, Milton, and NeNe had come upon Cade walking the night before. Stroud said that Cade flagged the car down and told them to stop. Stroud and Milton exited the car, and a physical altercation with Cade ensued, which moved over into the dirt on the side of the road. Stroud said that he was trying to separate Cade and Milton, and at one point, Milton pistol-whipped Cade. Stroud then heard a gunshot. Afterward, Stroud got back in the car with Milton and NeNe and drove off. Stroud said that he dropped NeNe and Milton at Milton's house, before he drove himself home.

The medical examiner who performed the autopsy on Cade's body testified that it appeared likely that a single bullet entered and exited his right arm, then re-entered his right torso where it struck a rib, his right lung, and ultimately his heart, resulting in massive hemorrhaging and death. However, the medical examiner did not rule out the possibility that the wounds to the arm and torso may have been caused by separate gunshots. The medical examiner also

found injuries to Cade's forehead consistent with a pistol-whipping.

2. Stroud argues on appeal that the State failed to present sufficient evidence to support this convictions beyond a reasonable doubt as required under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). "On appeal, a criminal defendant is no longer presumed innocent, and we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, enabled the jury to find the defendant guilty beyond a reasonable doubt of the crimes of which [he] was convicted." *Fitts v. State*, 312 Ga. 134, 141 (3) (859 SE2d 79) (2021), citing *Jackson*, 443 U.S. at 319 (III) (B). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Muse v. State*, 316 Ga. 639, 647 (2) (889 SE2d 885) (2023) (citation and punctuation omitted).

Stroud was charged both individually and as a party to a crime with felony murder and possession of a firearm in the commission of

a crime. A person commits felony murder "when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "Felony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony—in this case, aggravated assault, which also does not require intent to kill." *Mathews v. State*, 314 Ga. 360, 365 (1) (877 SE2d 188) (2022) (citation and punctuation omitted). OCGA § 16-11-106 (b) (1) prohibits any person from "hav[ing] on or within arm's reach of his or her person a firearm . . . during the commission of, or the attempt to commit . . . [a]ny crime against or involving the person of another."

OCGA § 16-2-20 (a) provides that "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." To obtain a conviction of a person as a party to the crime, the State must prove "that he intentionally aided or abetted in the commission of the crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes." *Frazier v. State*, 308 Ga. 450,

12

453 (2) (a) (841 SE2d 692) (2020). "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Rooks v. State*, 317 Ga. 743, 751 (2) (893 SE2d 899) (2023) (citation and punctuation omitted). Therefore, to prove Stroud guilty of the charges of felony murder and possession of a firearm during the commission of a felony, it was not necessary for the State to prove that he personally possessed a weapon or fired a gun at Cade as long as the State proved that Stroud acted as a party to those crimes. See *Scoggins v. State*, 317 Ga. 832, 836-39 (1) (a)-(b) (896 SE2d 476) (2023) (even where evidence did not conclusively establish which of two defendants shot victim or had a weapon, evidence of a common criminal intent, including defendant's presence, companionship, and conduct before and immediately after the fatal shooting supported convictions as a party to the crimes of murder and possession of a firearm).

We conclude that the evidence presented at trial, when viewed

in the light most favorable to the jury's verdict, was sufficient as a matter of constitutional due process to support Stroud's convictions for felony murder predicated on aggravated assault and possession of a firearm during the commission of a felony. The evidence, viewed in this light, showed that shortly before the shooting, Stroud was involved in a verbal altercation with Cade over Cade's physical fight with Shakevia at her grandparents' house. Afterward, Stroud followed Cade in his car and expressed a desire to beat him up. Stroud stopped the car when he saw Cade, argued with him, and then got out to confront him. Stroud then engaged in a physical altercation with Cade before the shooting, and Stroud's muddy appearance the next morning and the discovery of the pendant at the crime scene supported that he engaged in the fight. Moreover, Cade's blood was found on the front, center console of Stroud's car, along with mud on the floorboards. Although Stroud was not seen with a gun, NeNe testified that, after the shooting, she saw him bare-chested and placing his shirt on the floor of the car between his legs, from which the jury could have inferred that he was stashing a

gun wrapped in his shirt. She also testified that shortly after she heard a gunshot, Stroud returned to the car saying that he had "f****d up."

Although there also was evidence at trial that NeNe previously identified Milton as the shooter and that Shakevia saw Milton with a gun shortly before Cade was shot, and although the ballistics evidence was inconclusive about how many guns were involved in the shooting, "it is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Reed v. State*, 314 Ga. 534, 537 (1) (878 SE2d 217) (2022). See also *Lewis v. State*, 314 Ga. 654, 659 (2) (878 SE2d 467) (2022).

Moreover, even if the jury believed that Milton, and not Stroud, shot Cade, there was ample evidence of Stroud's conduct before, during, and after the shooting for the jury to find Stroud guilty as a party to the crimes because of a shared criminal intent. The evidence recounted above supported that Stroud was involved in a fight with

Cade, Stroud indicated to Agent Bradshaw that Cade was shot during the course of the fight, and he and Milton rode away from the scene together after the shooting, leaving Cade there. See *Scoggins*, 317 Ga. at 837 (1) (a); *Martin v. State*, 316 Ga. 154, 154, 155-56 (2) (886 SE2d 795) (2023) (evidence sufficient to support defendant's conviction as a party to the crimes of felony murder and possession of a firearm during the commission of a felony where defendant's cell phone was recovered at the crime scene and it contained photos of defendant wearing distinctive shirt shown in surveillance footage of man struggling with the victim moments before victim was shot); *Williams v. State*, 291 Ga. 501, 504 (1) (c) (732 SE2d 47) (2012) (concluding that the evidence established that defendant was a party to the crime where it showed that he was present when the crimes were committed and the jury could infer from his conduct before and after the crimes that he shared a common criminal intent with the actual perpetrators); *Johnson v. State*, 276 Ga. 368, 371 (1) (578 SE2d 885) (2003) (although the evidence showed that weapon was in the physical possession of defendant's co-indictee, defendant

16

was guilty of possession of a firearm during the commission of a felony where defendant was accomplice of the person who was in physical possession of the pistol).

Accordingly, we conclude that the evidence at trial was sufficient to authorize the jury to find Stroud guilty of felony murder and the firearm possession charge beyond a reasonable doubt as either a direct participant or as a party to the crimes.

3. Stroud also asserts that the trial court erred in denying his motion for directed verdict made at the close of the State's evidence at trial.

However, "[t]he standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Smith v. State*, 304 Ga. 752, 754 (822 SE2d 220) (2018) (citation and punctuation omitted). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." (Citation and punctuation omitted.) *Frazier*, 308

Ga. at 453-54 (2) (a). Therefore, this enumeration fails for the same reasons discussed in Division 2.

*Judgment affirmed. All the Justices concur.*