**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the

# Supreme Court of Georgia

No. S26A0122
Keyondre Preston
v.
The State

On Appeal from the Superior Court of Newton County
No. 2021CR6892

Decided: June 2, 2026

LaGrua, Justice.

Appellant Keyondre Preston appeals his convictions for malice murder and other crimes related to the shooting death of Shelvis Hillman.[1] On appeal, Preston argues that (1) the evidence

---

[1] Hillman was killed on April 3, 2019. On June 7, 2019, a Newton County grand jury indicted Preston, and on July 23, 2021, a grand jury re-indicted Preston for the following counts: malice murder (Count 1); felony murder predicated on armed robbery (Count 2); felony murder predicated on aggravated assault (Count 3); armed robbery (Counts 4–6); aggravated assault (Counts 7–9); burglary in the first degree (Counts 10 and 11); and possession of a firearm during the commission of a felony (Counts 12–14). Preston was tried from October 18 to 21, 2021, and the jury found Preston guilty on all counts except Count 2. The trial court sentenced Preston to life without the possibility of parole on Count 1; life in prison on each of Counts 4–6, to run concurrently; twenty years to run concurrent on Count 10; and five years to run consecutive on each of Counts 12–14. The remaining counts merged or were vacated by operation of law. Preston filed a timely motion for new trial, which he later amended on September 2, 2023. The trial court denied the motion on October 30, 2024. Preston filed a timely notice of appeal, and his case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

was constitutionally insufficient to support the verdicts; (2) the trial court abused its discretion by admitting other-act evidence of two prior incidents; and (3) the trial court erred by refusing his request to charge the jury on justification and related concepts. For the reasons set forth below, Preston's arguments fail. Accordingly, we affirm.

The evidence presented at trial showed that, during the evening hours of April 3, 2019, Preston shot and killed Hillman at the home of his uncle, Charlie Hillman. Preston then robbed Hillman, Charlie, and Curtis Kimbrough, Charlie's roommate.

Earlier that same day, Preston, who also went by "Peanut," accompanied David Catlett to the home of Hillman's father, Stanley Hillman, who was friends with Catlett. When Preston and Catlett arrived at Stanley's house, Stanley's fiancée told them that Stanley was not home, but the two men came inside the house anyway.[2] Stanley's dog was in the house and began barking at them. Preston pulled a gun and shot at the dog but missed. Stanley's fiancée then "threw them outside," called Stanley, and told Stanley to come home because somebody just shot at his dog.

After receiving this call, Stanley returned home, and Hillman and Charlie accompanied him. When the three men arrived, they saw Preston and Catlett waiting outside the house.[3] Stanley and Hillman began arguing with Catlett and Preston,[4] and Preston told Hillman, "[Y]a'll don't know who the f**k y'all f***ing with." Preston and Catlett left and walked to Catlett's

---

[2] Stanley's fiancée testified that she knew Catlett but did not know the person who was with Catlett.

[3] Charlie and Stanley testified that, although they knew Catlett well, they had never seen Preston before.

[4] Charlie testified that he did not participate in the conversation in the yard.

2

grandfather's house, where they saw Preston's uncle, Deandre Arnold, and Catlett's cousin, Jamarcus Latimore. Preston told Arnold that "somebody just tried him," which, according to Catlett, meant he "felt disrespected."

Around 8:00 p.m. that night, Arnold picked up his wife, Letonya Arnold, from work in her van, and Preston, Catlett, and Latimore were with him. When Letonya got into the van, she heard Preston say that he shot at Stanley's dog. Letonya also noticed that Preston and Arnold both had a gun "on [their] hips," and the men appeared "inebriated," "sluggish," and "on a substance." The group then drove to Stanley's house because Arnold, who was friends with Stanley, wanted to talk to Stanley about Preston shooting at his dog. When they arrived, Stanley's fiancée told them that Stanley was at Charlie's house, so the group drove over there. When the group arrived at Charlie's house, Letonya remained in the van, but everyone else went to the back door of the house, which led into the kitchen.

Charlie testified that he and Hillman had been talking in the kitchen, and Charlie left briefly to go to the restroom. When Charlie came out of the restroom, he saw Arnold standing there, holding a gun by his side. Charlie told Arnold that he did not allow guns in the house, and Arnold left the house. According to Charlie, after Arnold left the house, "the shooter"[5] came into the kitchen and "shot [Hillman] point-blank."[6] Charlie testified that, prior to the shooting, the shooter "[d]idn't say no word. Didn't say nothing." Charlie further testified that, as Hillman fell to the floor

_____

[5] Charlie testified that, although he did not know the name of the shooter, the shooter was the same person he had seen in Stanley's yard with Catlett earlier that afternoon.

[6] Hillman was later transported to the hospital, where he died from a gunshot wound to the torso.

"holding his stomach," he saw a gun in Hillman's hand, but Charlie had not seen Hillman with a gun before this moment. Catlett—who was not in the kitchen and was instead outside of the house near the back door at the time—testified that Preston and Hillman were arguing right before the shooting, and Catlett heard Hillman say, "I got a gun, too."

Letonya testified that, while she was sitting in the van with the windows open,[7] she heard Preston say, "[G]ive me what you got," followed by a gunshot. After hearing the gunshot, Letonya exited the van and went to the back door of the house, where she saw Hillman bleeding on the kitchen floor. Letonya also saw Preston standing in the kitchen holding a gun, and she heard Arnold ask Preston why he shot Hillman.

Kimbrough testified that, prior to the shooting, he was listening to music in the living room when he heard "something like a pop," then he walked to the kitchen, where he saw Hillman lying on the floor and Charlie on his knees with his hands locked behind his head. Kimbrough felt something cold on his neck and realized that a gun was being pointed at him by a man he had never seen before. Catlett testified that, around this time, he went to the kitchen, where he heard Preston tell Charlie and Kimbrough to "give him their stuff," and saw Charlie and Kimbrough "getting on the ground" and emptying their pockets, which included a cell phone, keys, and cash, and throw them on the floor. Preston then grabbed items off the floor,[8] picked up Hillman's gun, went through Hillman's pockets, and left the house.

---

[7] Letonya also testified that, around this time, the back door to Charlie's house was open.

[8] Kimbrough testified that both Arnold and the person he did not know grabbed items off the floor.

4

After the shooting, Preston, Arnold, Letonya, Catlett, and Latimore returned to the van. Letonya testified that, when Preston got into the van, she saw Preston holding "the gun, a book bag, and another gun in his hand and some keys." After Arnold returned to the van, he told Letonya that Preston shot Hillman and took his gun. Someone told Letonya "to drive," and the group left. When the group dropped off Catlett and Latimore, Preston told Catlett, "Better not snitch" and "Don't say nothing." Letonya then drove to a gas station, where Preston exited the van. When Preston left, he took the two guns with him but left the stolen keys behind.

When officers responded to the scene, they recovered a 9mm cartridge casing near the back door,[9] as well as keys and a small amount of change on the floor. Later that same night, Covington Police Department Detective Julie English went to Stanley's house to investigate the shooting incident involving Stanley's dog, and she found a 9mm cartridge casing on the floor near the front door. Subsequent testing revealed that the cartridge casing found in Stanley's home and the cartridge casing found in Charlie's home were both fired from the same gun.

On April 4, the day after the shooting, Letonya and Arnold turned themselves in to law enforcement and were arrested for murder, armed robbery, and aggravated assault.[10] Detective English testified that Arnold was intoxicated, shouting, and "raising cane, going on saying he didn't do s**t, it was his nephew Keyondre that shot the man." After hearing this, Detective

---

[9] The medical examiner who conducted Hillman's autopsy recovered one 9mm bullet from Hillman's body, but the weapon that fired the bullet was never recovered.

[10] Letonya and Arnold were both granted immunity for their testimony at Preston's trial.

5

English looked up Arnold's Facebook page, where she saw "a Keyondre as a friend on [F]acebook." When she did so, Arnold looked and said, "That's him, that's him," and pointed at Preston's Facebook page.

In Letonya's initial interview that night, she indicated that she did not know the shooter, but in a subsequent interview, she identified the shooter as "Peanut," saying that "she has known Peanut, the shooter, ever since he was a child." Officers later executed a search warrant for Letonya's van and recovered two sets of keys. One set had a Chevrolet key and a heart-shaped keychain that said "Shelvis & Patrice," and the other had two Mercedes key fobs, which officers later learned belonged to Charlie.

On April 5, investigators created a photo lineup that included a picture of Preston and showed it separately to Arnold, Letonya, and Catlett, who all identified Preston as the shooter. On April 20, Detective English received a tip that Preston was at a hotel in Cordele, and officers apprehended him at that hotel. Detective English testified that, at the time of Preston's arrest, his head was clean-shaven, but during previous interviews with witnesses, Preston was described as having "twists in his hair." During the arrest, officers seized a black shoulder bag and a .40 caliber pistol[11] from the bathroom in Preston's hotel room.

1. Preston contends that the evidence was insufficient as a matter of constitutional due process to support his convictions for malice murder, armed robbery, and burglary under the standard set forth in *Jackson v. Virginia*, 443 US 307, 319 (1979). For the

---

[11] The firearms examiner testified that this pistol did not fire the bullet that killed Hillman, nor did it eject the cartridge casings that were found at Stanley's and Charlie's houses.

6

reasons explained below, this claim fails.

When evaluating a challenge to the constitutional sufficiency of the evidence, "we view the evidence presented in the light most favorable to the verdicts to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." See *Weems v. State*, 318 Ga. 98, 101 (2024) (citing *Jackson*, 443 US at 319). "The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case." *Copeland v. State*, 316 Ga. 452, 455 (2023). And, "[w]e defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts." *Hooks v. State*, 318 Ga. 850, 852 (2024).

Here, when properly viewed in the light most favorable to the verdicts, there was sufficient evidence for the jury to find Preston guilty of the crimes for which he was convicted. As to the malice murder count,[12] Preston primarily argues that the evidence presented about Hillman's shooting was "highly conflicting," "many of the witnesses had reasons for adjusting their testimony," and he was "an easy person to blame for the shooting even if he had not been responsible." But, as we have often said, "it is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Stroud v. State*, 318 Ga. 744, 750 (2024) (quotation marks omitted). See also OCGA § 24-14-8

---

[12] Under OCGA § 16-5-1(a), "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." And we have held that "[t]he malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." *Pinkins v. State*, 319 Ga. 595, 601 (2024) (quotation marks omitted).

7

("The testimony of a single witness is generally sufficient to establish a fact."). And, here, despite any conflicting testimony among the witnesses, the evidence established that, on the day of the shooting, Preston had a confrontation with Hillman, in which Preston told Hillman, "[Y]a'll don't know who the f**k y'all f***ing with." After that confrontation, Preston told Arnold that "somebody just tried him," meaning that he felt disrespected. Later that night, when the group went to Charlie's house, Preston was armed with a gun, and after Hillman's shooting—which Charlie testified was at "point-blank"—Letonya saw Preston holding a gun in the kitchen and heard Arnold ask Preston why he shot Hillman. In speaking to Letonya and Detective English after the shooting, Arnold confirmed that Preston shot Hillman. The firearms examiner also determined that a cartridge casing found inside Stanley's house, where Preston shot at Stanley's dog, and a cartridge casing found in Charlie's house, where Hillman was shot, were both fired from the same gun. Given this evidence, the jury was authorized to find Preston guilty of malice murder. See *Pierce v. State*, 319 Ga. 846, 850 (2024) (holding that the evidence was sufficient to support the appellant's conviction for malice murder where, among other things, a witness "found [a]ppellant standing with a gun over [the victim's] dead body" immediately after hearing a gunshot).

Likewise, there was sufficient evidence for the jury to find Preston guilty of armed robbery.[13] On appeal, Preston argues that the evidence was insufficient to support his conviction for armed robbery because the testimony was conflicting as to his

_____

[13] Under OCGA § 16-8-41(a), "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon."

"involvement in taking items from [Hillman], [Kimbrough], and Charlie," but this argument fails because, as noted above, any conflicts in the evidence are for the jury to resolve. See *Stroud*, 318 Ga. at 750. And, here, the evidence showed that Preston was armed with a gun when he went to Charlie's house, and after Preston and the group went inside Charlie's house, Letonya overheard Preston say, "[G]ive me what you got," before hearing a gunshot. After the shooting, Letonya saw Preston holding a gun. Additionally, Catlett saw Preston take Hillman's gun; he saw Charlie and Kimbrough "getting on the ground" and pulling stuff out of their pockets; and he heard Preston tell them to "give him their stuff." When the group returned to the van, Arnold told Letonya that Preston took Hillman's gun, and Letonya saw Preston holding "the gun, a book bag, and another gun in his hand and some keys." Finally, when law enforcement searched Letonya's van, they found Charlie's car keys and a set of keys with a "Shelvis & Patrice" keychain. We conclude that this evidence was constitutionally sufficient to enable the jury to find Preston guilty of armed robbery beyond a reasonable doubt. See *Dillard v. State*, 321 Ga. 171, 174–75 (2025) (holding that evidence was sufficient to support the appellant's convictions for armed robbery where it showed that the appellant pointed his gun at two victims, demanded their possessions, and took a backpack).

The evidence was also sufficient for a reasonable jury to convict Preston for first-degree burglary.[14] For the burglary count at issue, Preston was convicted for entering or remaining within Charlie's home with the intent to commit aggravated assault. On appeal, Preston argues that there was no evidence that he

[14] Under OCGA § 16-7-1(b), "[a] person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another."

"entered or remained in [Charlie's] home unlawfully or without authority."[15] But we have said that, where a defendant enters a victim's home and subsequently assaults and attempts to rob the victim, the evidence would support a burglary conviction for remaining in the home without authority. See *Bell v. State*, 287 Ga. 670, 673 (2010) ("The evidence that, once inside the apartment, [appellant] assaulted [the victim] and sought to rob him would support a conviction for 'remain[ing]' in the dwelling without authority.") Here, contrary to Preston's argument, the evidence showed that Charlie and Kimbrough did not know Preston, and there was no evidence that Preston was invited to Charlie's house before going there. Additionally, Charlie testified that, after Arnold left the house, Preston came inside, and Charlie did not say that Preston was accompanied by any people Charlie knew. Preston then shot Hillman—Charlie's nephew—"point-blank," and he robbed Charlie, Hillman, and Kimbrough, after holding a gun to Kimbrough's neck and forcing Charlie and Kimbrough to get on the ground. Based on this evidence, the jury could have reasonably concluded that Preston did not have authority to enter or remain within Charlie's home, and that he did so with the intent to commit aggravated assault. Thus, the evidence was sufficient to support Preston's conviction for first-degree burglary. See *Gines v. State*, S25A1305, slip op. at 7–9 (Ga. Mar. 12, 2026) (2026 WL 696353) (holding that the evidence was sufficient "for the jury to make the reasonable inference that the [a]ppellants remained in [the victim's] home without authority"

---

[15] Preston makes this argument for both burglary counts (Counts 10 and 11). However, because Count 11 was vacated, his arguments relating to the sufficiency of that count are moot and will not be addressed. See *Anderson v. State*, 299 Ga. 193, 196 n.4 (2016) (concluding that, where a count is vacated for sentencing purposes, the defendant is not convicted on that count, and a challenge to the sufficiency of evidence to support that count is moot).

10

and, thus, was sufficient to support the appellant's burglary conviction where it showed that, once he and the other appellants were inside the victim's home, they robbed and shot the victim).

Accordingly, after viewing the evidence in the light most favorable to the verdicts, we conclude that the evidence was sufficient as a matter of constitutional due process to authorize a rational jury to find Preston guilty beyond a reasonable doubt of all the crimes for which he was convicted. See *Dillard*, 321 Ga. at 174–75.

2. Preston also argues that the trial court abused its discretion by admitting other-act evidence under OCGA § 24-4-404(b) ("Rule 404(b)"). For the reasons that follow, we conclude that, because the other-act evidence was admissible under Rule 404(b) to prove intent, the trial court did not clearly abuse its discretion in admitting this evidence for that limited purpose. See *Hall v. State*, 322 Ga. 378, 382 (2025) ("A trial court's decision to admit evidence under Rule 404(b) will be disturbed only if it constitutes a clear abuse of discretion." (quotation marks omitted)).

Before trial, the State moved to admit evidence that Preston committed two prior crimes in 2018 (the "2018 incidents"). The trial court held a hearing on the State's motion and ruled that the evidence was admissible for the purpose of proving intent. At trial, Ilyas Numan testified that, on May 25, 2018, he went to a convenience store near his apartment complex, where he saw a man—later determined to be Preston[16]—who had

---

[16] After the incident, Numan met with DeKalb County Police Department Detective Jerad Wheeler and watched the convenience store's surveillance video. After watching the video, Numan identified the man who robbed him, and surveillance video screenshots of Numan and Preston in the

11

a "little -- eye -- eye thing" on his face. Prior to this encounter, Numan had never seen Preston before. After leaving the store, Numan eventually went home, where he saw Preston near the front gate of his apartment complex. Numan rolled down his window, Preston "gave [Numan] some herb," Numan gave Preston money, and then Preston pulled out a gun. Preston said, "Don't do anything stupid," and made Numan empty his pockets. Numan then put the car in park and ran from the car. As he was running, Numan heard gunshots, and Preston drove the car away.

Additionally, Stefan Ellington testified that, on the morning of June 11, 2018, he was working as a Lyft driver. Ellington was sitting in his car when he felt a gun pressed against his head. The person holding the gun—later determined to be Preston[17]—told Ellington not to move and to put his hands up, and another man, who was with Preston, got into Ellington's passenger seat. Preston told the man to take Ellington's keys and wallet from his pocket, which he did. Ellington was then told to get out of the car and not to move. After Ellington got out of the car, Preston started to get in the driver's seat. As Preston was

---

convenience store were shown to the jury. At the conclusion of his testimony, Numan identified Preston in the courtroom as the person who robbed him. Additionally, Detective Wheeler testified that, after reviewing the surveillance video with Numan, he made still-shot photos of the suspect and distributed the photos to other detectives in his unit. Several detectives recognized the suspect as Preston.

[17] After the incident, Ellington met with law enforcement and viewed a photo lineup, which included six males who all had a face piercing, and he identified Preston as the person who held the gun to his head and fired the gunshots. Additionally, DeKalb County Police Department Detective Antwon Winston testified that Ellington picked Preston, whom Detective Winston knew as "Peanut," from the photo lineup.

12

getting in the car, he took the gun off Ellington, and when he did so, Ellington ran away. Ellington then heard someone yell, "Hey," followed by the sound of one or two gunshots.

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence may be admissible for other purposes, including to prove intent. See OCGA § 24-4-404(b). See also *Henderson v. State*, 318 Ga. 752, 754–55 (2024) ("Rule 404(b) is a rule of inclusion, but it does prohibit the introduction of other acts evidence when it is offered for the sole purpose of showing a defendant's bad character or propensity to commit a crime." (quotation marks omitted)). Therefore, a party offering Rule 404(b) evidence must show:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Heard v. State*, 309 Ga. 76, 84 (2020). On appeal, Preston does not dispute that there was sufficient proof for a jury to find by a preponderance of the evidence that he committed the 2018 incidents, so we address only the first and second parts of this test. See *Hood v. State*, 309 Ga. 493, 499 (2020).

As to the first part, "we look to OCGA § 24-4-401, which defines relevant evidence as evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Rooks v. State*, 317 Ga. 743,

13

756 (2023) (cleaned up). Here, because Preston entered a plea of not guilty and did not take affirmative steps to remove intent as an issue, he made intent a material issue in this case. See *Mitchell v. State*, 317 Ga. 107, 111 (2023) ("[A] defendant who enters a not guilty plea makes intent a material issue, and the State may prove intent by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." (cleaned up)).

Because intent was at issue, the relevance of the 2018 incidents was satisfied as it required the same state of mind as some of the crimes with which Preston was charged in this case. As noted above, Preston was charged in this case with armed robbery, felony murder predicated on armed robbery, aggravated assault, and felony murder predicated on aggravated assault, among other crimes. "And we may consider whether the other acts were relevant to the issue of intent on any of these offenses." *Greene v. State*, 316 Ga. 584, 598 (2023) (quotation marks omitted). Because the charged offenses of armed robbery and aggravated assault involved a similar intent to the 2018 incidents involving Numan and Ellington—which could have constituted aggravated assaults and armed robberies—the 2018 incidents were relevant to prove Preston's intent in the charged crimes. See id. See also *Mitchell*, 317 Ga. at 111 ("Because intent was at issue, the relevance of the [prior] robbery was satisfied because it required the same state of mind (intent to rob) as some of the crimes—felony murder predicated on armed robbery and armed robbery—that [appellant] was charged with here."). As such, because the 2018 incidents were relevant to an issue other than Preston's character, the first part of our Rule 404(b) test has been met. See *Henderson*, 318 Ga. at 755 (concluding that the first part of the Rule 404(b) test is satisfied "[w]here the intent required for the charged offenses and other acts is the same, and intent is at

14

issue").

Having concluded that the 2018 incidents were relevant to prove intent, we now turn to the second part of the Rule 404(b) test, which is governed by OCGA § 24-4-403 ("Rule 403"). See *Rooks*, 317 Ga. at 757.

> Rule 403 provides for the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. In other words, other acts evidence should be excluded if it constitutes matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it.

*Hood*, 309 Ga. at 500–01 (citations and punctuation omitted). When evaluating overall similarity, we must also consider any differences between the other acts and the charged crimes. See *Mitchell*, 317 Ga. at 111. And, "when other act evidence is introduced to prove intent, a lesser degree of similarity between the charged crime and the extrinsic evidence is required than when it is used to prove identity." *Greene*, 316 Ga. at 600 (cleaned up).

First, the charged crimes in this case and the 2018 incidents had many similarities. In all three incidents, Preston robbed the victims at gunpoint, took items from the victims'

15

pockets, and fired his gun at the victims to either threaten or shoot them. Additionally, in the 2018 incidents, neither Ellington nor Numan knew Preston, and in the present case, at least two of the victims—Charlie and Kimbrough—testified that, prior to the day of the incident, they had never seen Preston before, and he was a stranger to them.[18] Kimbrough, in particular, had never seen Preston prior to Preston holding a gun to his neck and telling him to empty his pockets.[19] On the other hand, there were also differences between the 2018 incidents and the crimes charged in this case. For example, in the 2018 incidents, Preston stole the victims' cars, whereas during the charged crimes, he did not steal any vehicles, but only two sets of car keys. Additionally, in the 2018 incident involving Ellington, Preston did not interact with Ellington prior to robbing him, but in this case, Preston encountered Charlie and Hillman at Stanley's house earlier in the day before robbing them at Charlie's house later that night. But these differences are not substantial. Although Preston did not steal a vehicle during the subject incident, he used a gun to rob Hillman, Charlie, and Kimbrough—similar to the prior incidents involving Numan and Ellington—and he stole the victims' car keys. Moreover, while Preston encountered Hillman and Charlie at Stanley's house earlier in the day of the charged crimes, Charlie testified that he did not actually interact or participate in any conversation with Preston, making Preston's later encounter with Charlie at Charlie's house similar to Preston's encounter with Numan, whom he also likely saw at a convenience store prior

[18] The record does not demonstrate whether Hillman knew Preston before the day of the shooting.

[19] As noted above, because Kimbrough did not know Preston, he did not identify Preston as the person who robbed him, and he was not asked at trial whether Preston was the person who robbed him. However, the testimony from Catlett, Charlie, and Letonya indicated that Preston was the person who robbed Kimbrough.

to robbing Numan.

Because the circumstances surrounding the 2018 incidents were sufficiently similar to the charged crimes, the evidence of the 2018 incidents—and Preston's intent in carrying them out—were probative of his intent here. See generally *Greene,* 316 Ga. at 600–01. And the differences between the 2018 incidents and the charged crimes were "not so significant that it was an abuse of discretion for the trial court to conclude that the similarities gave the evidence" of the 2018 incidents "substantial probative value." *Rooks*, 317 Ga. at 758. See also *Mitchell*, 317 Ga. at 111 (concluding that any slight differences between the prior acts and the charged offenses were "not so significant such that it would have been an abuse of discretion to conclude that the similarities gave the other-acts evidence substantial probative value").

Additionally, the "significant probative value" of the 2018 incidents was not "diminished by its temporal remoteness," *Rooks*, 317 Ga. at 758, as the 2018 incidents both happened within one year of the charged crimes. See *Mitchell*, 317 Ga. at 112 (concluding that the probative value of the other-act evidence "was not diminished by temporal remoteness, as the events were separated by only two years").

Finally, the prosecutorial need for the other-act evidence was fairly significant. When the State sought to admit the 2018 incidents before trial, it argued that it needed the evidence to rebut a potential self-defense argument. Although Preston did not testify at trial, the record shows that, during Preston's cross-examination of witnesses, he pursued alternative defenses: (1) that he was not the perpetrator of the charged crimes or was not present when the crimes occurred; and (2) if he was present, that he acted in self-defense. Regarding his alleged absence during the charged crimes, Preston's counsel asked Preston's family

17

members and one of the Rule 404(b) witnesses whether Preston had a piercing on his face, and asked investigators of the charged crimes whether any of the witnesses to the incident mentioned a distinctive feature on the shooter's face. As to self-defense, Preston's counsel asked witnesses whether Hillman owned a gun, carried a gun, and had a concealed carry license[20]; whether Hillman was drinking on the day of the incident; and whether people feared Hillman.

Because Preston pursued alternative defenses at trial, the State needed the evidence of the 2018 incidents to prove that Preston was both present at the scene of the incident and that he committed the charged crimes with the requisite intent. See generally *Henderson*, 318 Ga. at 757 (concluding that the prosecutorial need for other-act evidence was significant where the defendant argued that he "blacked out" during the charged crimes, and, alternatively, that he was provoked by the victim, because "the State needed evidence from which the jury could infer that his acts were intentional rather than defensive or committed while 'blacked out' or 'in a trance'"); *Rooks*, 317 Ga. at 758 (concluding that the prosecutorial need for other-act evidence was higher where the defendant's defense to the charged crimes was that he was merely present at the scene when someone else shot and killed the victim). Further, there were conflicts in the evidence that the State needed to overcome. Namely, Charlie testified that Arnold was the person who robbed him, despite telling investigators in pretrial interviews that it was Preston. Given this conflict in the evidence and the alternative defenses

---

[20] Charlie testified that Hillman had a concealed carry permit, and investigators later found a concealed carry permit inside Hillman's wallet. Additionally, Arnold testified that he had seen Hillman with a gun prior to the day of the incident, and Kimbrough testified that Hillman sometimes carried a gun.

pursued by Preston through cross-examination at trial, the probative value of the 2018 incidents was strengthened by the State's need for the evidence to prove intent. See generally *Henderson*, 318 Ga. at 757; *Rooks*, 317 Ga. at 758.

Taking all of this into account—the similarities between the 2018 incidents and the charged crimes, the close proximity between them, and the prosecutorial need for this evidence—the 2018 incidents provided significant probative value. And, although evidence that Preston had committed these prior incidents was "prejudicial, the evidence was not a matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Rooks*, 317 Ga. at 759 (quotation marks omitted). Further, "in a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." *Henderson*, 318 Ga. at 757 (quotation marks omitted). Moreover, here, any prejudice was diminished by the trial court's limiting instruction,[21] which it gave to the jury prior to the

---

[21] The limiting instruction included the following:

In order to prove its case in these counts that you're hearing about, the State must show intent. To do so, the State has -- is going to offer evidence of other acts allegedly committed by the accused. You're permitted to consider that evidence only insofar as it may relate to that issue and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes. The evidence may be considered only to the extent that it may show the element that the State is required to prove in the crimes charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose. The defendant is on trial for the offenses charged in this bill of indictment only and not for any other acts, even though such acts may

19

admission of any testimony related to the 2018 incidents and again during the jury charge before deliberations. See id. (concluding that the trial court did not abuse its discretion in ruling that the probative value of other-acts evidence was not substantially outweighed by any unfair prejudice, and noting that "[t]his is particularly true given that the trial court instructed the jury … that this evidence was to be considered only for the limited purposes for which it was admitted"). Although this evidence was prejudicial, Preston has not demonstrated that any unfair prejudice substantially outweighed its probative value.

Under these circumstances, we conclude that Preston has failed to show that the trial court clearly abused its discretion in admitting evidence of the 2018 incidents at trial. See *Mitchell*, 317 Ga. at 110 (holding that, where the defendant was charged with malice murder, armed robbery, aggravated assault, and other crimes, the trial court did not abuse its discretion in admitting other-act evidence of a prior armed robbery for the purpose of showing intent).

3. Preston contends that the trial court erred by refusing his request to charge the jury on justification and related

incidentally be criminal. Before you may consider any of the alleged acts for the limited purpose stated, you must first determine whether it is more likely than not the accused committed the other alleged acts. If so, you must then determine whether the act shed any light on the elements of the offenses or issues for which the act was admitted in the crimes charged in the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence by other acts of the defendant. And, by giving this instruction, the Court in no way suggests to you that the defendant has or has not committed any other acts, nor whether such acts, if committed, prove anything. This is solely a matter for your consideration.

20

concepts,[22] arguing that a justification charge was warranted because the evidence showed that Hillman was known to carry a gun, was heard saying that he had a gun on the night of the shooting, and was seen holding a gun after Preston shot him, which "could have permitted a jury to determine that Preston shot [Hillman] in self-defense." Assuming without deciding that the trial court erred by refusing to charge the jury on justification, this claim nevertheless fails because any such error was harmless.

"Whether the evidence presented is sufficient to authorize the giving of a jury charge is a question of law." *Gray v. State*, 319 Ga. 72, 75 (2024) (quotation marks and brackets omitted). "To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge, but the failure to give a requested charge which is authorized by the evidence can be harmless error." *Rana v. State*, 320 Ga. 66, 71 (2024) (quotation marks omitted). "The test for determining whether a nonconstitutional instructional error was harmless is whether it is highly probable that the error did not contribute to the verdict." *Gray*, 319 Ga. at 75 (quotation marks omitted). Here, we need not decide if the trial court erred in failing to charge the jury on justification, as it is "highly probable" that any such instruction "would not have changed the outcome of the trial." *Rana*, 320 Ga.

---

[22] In addressing Preston's requested charges on justification during the charge conference, the trial court stated that there was no evidence of an aggressive act by Hillman and that Hillman's possession of a gun, which he had a permit for, was not a crime. The trial court also noted that a witness heard Hillman say, "'I've got a gun, too,' which implie[d] that [Preston] had already drawn his gun and was pointing it at [Hillman]." The trial court further observed that the evidence included an eyewitness to the shooting, Charlie, who "never said that [Hillman] was the one that pulled the gun on [Preston]." The trial court thus declined to give Preston's requested charges on justification, and Preston's counsel objected to the trial court's ruling.

at 71 (quotation marks omitted).

In this case, the evidence presented against Preston was strong. That evidence included Letonya's testimony that Preston had a gun on him when the group went to Charlie's house on the night of the shooting, and that she heard Preston say, "[G]ive me what you got," prior to hearing a gunshot. The evidence also included Charlie's testimony that "the shooter[23] came and shot [Hillman] point-blank." Additionally, Letonya testified that she went to the back door after hearing the gunshot, where she saw Preston holding a gun and heard Arnold ask Preston why he shot Hillman. And Catlett testified that, after the shooting, he saw Preston take Hillman's gun, saw Charlie and Kimbrough "getting on the ground" and pulling stuff out of their pockets, and heard Preston tell them to "give him their stuff." The evidence also showed that, after the shooting, Letonya saw Preston holding "the gun, a book bag, and another gun in his hand and some keys," and Preston told Catlett, "Better not snitch" and "Don't say nothing." Further, in speaking to Letonya and Detective English after the shooting, Arnold said that Preston shot Hillman. Finally, the firearms examiner determined that a cartridge casing found inside Stanley's house, where Preston shot at Stanley's dog, and a cartridge casing found in Charlie's house, where Hillman was shot, were both fired from the same gun.

Given the strong evidence of Preston's guilt, any evidence supporting a jury charge on justification and related concepts—to the extent that such evidence exists—was weak at best. As noted above, Preston argues that the jury could have determined that Preston shot Hillman in self-defense because the evidence showed that Hillman was known to carry a gun and was heard saying

---

[23] As noted above, Charlie testified that the shooter was the same person he had seen in Stanley's yard with Catlett earlier that afternoon.

that he had a gun prior to Preston shooting him. But there was no evidence showing that Preston ever saw Hillman with a gun prior to shooting him, that Hillman threatened Preston with a gun, or that Preston believed he had to shoot Hillman to defend himself. At most, the evidence showed that Catlett—who was outside of the house and did not witness the shooting—heard Hillman said, "I got a gun, too," which, as the trial court noted, "implie[d] that [Preston] had already drawn his gun and was pointing it at [Hillman]." Additionally, although Charlie—the only eyewitness to the shooting—testified that he saw Hillman holding a gun after Hillman was shot, he said that he did not see Hillman with a gun prior to this moment, and the evidence did not show that Hillman reached for a gun prior to being shot by Preston.

Therefore, it is highly probable that any error in failing to give the requested instructions did not contribute to the verdict. See, e.g., *Jones v. State*, 310 Ga. 886, 889–90 (2021) (holding it was highly probable that the jury's verdict was unaffected by any error in the trial court's refusal to instruct the jury on justification because the evidence of the defendant's guilt was strong and any evidence supporting the charge "was meager at best"); *Calmer v. State*, 309 Ga. 368, 372–73 (2020) (assuming without deciding that evidence that unidentified armed men (who turned out to be law enforcement officers) bursting into the defendant's home provided the slight evidence necessary to support the requested charge on self-defense, but holding that the trial court's failure to give that charge was harmless because "any weak inference that [the defendant] acted" in self-defense was "wholly undercut by other evidence to the contrary"). Accordingly, this enumeration fails.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

23